PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOHN DENNIS DANIELS,
              *Petitioner-Appellant,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
              *Respondent-Appellee.*

No. 02-9

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Chief District Judge.
(CA-99-225-3-MU)

Argued: October 29, 2002

Decided: January 10, 2003

Before WILKINSON, Chief Judge, and WIDENER and
KING, Circuit Judges.

Certificate of appealability denied and appeal dismissed by published
opinion. Judge King wrote the opinion, in which Chief Judge Wilkin-
son and Judge Widener joined.

## COUNSEL

**ARGUED:** Kimberly Candace Stevens, STEVENS & WITHROW,
P.L.L.C., Winston-Salem, North Carolina; Ann Bach Petersen,
GLOVER & PETERSEN, P.A., Chapel Hill, North Carolina, for
Appellant. Edwin William Welch, Special Deputy Attorney General,

NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North
Carolina, for Appellee. **ON BRIEF:** Roy Cooper, Attorney General,
NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North
Carolina, for Appellee.

---

## OPINION

KING, Circuit Judge:

In September of 1990, John Dennis Daniels was convicted in the
Superior Court of Mecklenburg County, North Carolina, of capital
murder and multiple related crimes. The jury recommended that Dan-
iels be sentenced to death and the presiding judge imposed the death
sentence. After an unavailing direct appeal process, Daniels unsuc-
cessfully sought post-conviction relief in the courts of North Carolina.
He then petitioned for habeas corpus relief in the Western District of
North Carolina. The district court denied his petition, and Daniels
now seeks to appeal that denial to this Court. As explained below,
Daniels has failed to make a substantial showing of the denial of any
of his constitutionally protected rights. We therefore decline to issue
a certificate of appealability, and we dismiss his appeal.

I.

A.

Daniels was indicted in early 1990 by a Mecklenburg County grand
jury for the strangling death of his aunt, seventy-seven-year-old Isa-
belle Daniels Crawford. He was also charged with assault with a
deadly weapon against his wife, his son, and a neighbor; with com-
mon law robbery; and with the attempted burning of his dwelling. In
rejecting Daniels's direct appeal, the Supreme Court of North Caro-
lina summarized the relevant facts underlying the jury's verdict. *State
v. Daniels*, 446 S.E.2d 298, 304-07 (N.C. 1994). We are unable to
improve on that factual summary, and we here set it forth *in haec
verba*:

> By 3:00 p.m. on 17 January 1990, defendant, John Dennis
> Daniels, had consumed two beers. Later, he consumed a

fifth of wine and became "somewhat drunk." In the late afternoon or early evening, defendant went to the home of his seventy-seven-year-old aunt, Isabelle Daniels Crawford, to ask for money and to ask if Crawford would permit defendant's wife, Diane, and his twelve-year-old son, Maurice, to stay with Crawford. Defendant was behind on his rent, and he was having marital problems. Upon arrival at Crawford's house, defendant asked Crawford for money and asked her to take in his wife and son. Crawford did not give defendant any money and told defendant that she intended to phone his mother. Defendant told Crawford not to call his mother and then punched Crawford in the mouth, knocking her to the floor. Defendant, using an electrical cord he wrapped around his aunt's neck three times, strangled Crawford and dragged her body to the back of the house. He located Crawford's purse, removed $70.00 to $80.00, and left. In his pre-trial statement, defendant stated, "I don't know why I killed her. Bills set me off. My lady has got bills. I tried to kill my lady."

After purchasing some cocaine, defendant walked around Charlotte and then returned to his home around 10:30 p.m. At home, he spoke briefly with his wife, Diane, and smoked some cocaine in their bathroom. After smoking the cocaine, defendant left the bathroom, holding a hammer. He approached his wife, who was lying on the bed in their bedroom, and began striking her in the head with the hammer. A struggle ensued during which defendant lost the hammer. Responding to defendant's wife's cries for help, their son, Maurice, joined the altercation. The fight moved into the hallway, where defendant hit his wife on the head with a kerosene heater. Defendant then chased his wife and son into the kitchen and den as defendant's wife attempted to get out of the house. Once in the den, defendant got a rock out of the aquarium and struck Maurice with it; defendant then found the hammer and hit Maurice in the head with it. Defendant's wife and son were finally able to run out the front door. Defendant pursued his wife outside and again hit her in the head with the hammer; he then returned to his house.

The Daniels' neighbor, Glenn Funderburke, was aroused by the commotion and went outside. Funderburke discovered defendant's son, Maurice, in his yard and took him into Funderburke's house. He then phoned the police and went to defendant's house to investigate. Upon entering defendant's house, Funderburke noticed flames near defendant. Defendant, holding a knife, threatened to kill Funderburke if Funderburke did not leave. Funderburke immediately returned to his home and again phoned the police.

At about 12:30 a.m., Charlotte Police Officer Thomas Griffith arrived on the scene, joining two other officers and a fire truck that had already arrived. Griffith observed the house on fire. After extinguishing the fire, the firemen brought defendant from the house and gave him oxygen. After defendant refused further medical treatment, Officer Griffith told defendant that he was going to jail for assault. At about 12:50 a.m., Griffith left the scene with defendant and proceeded toward the Law Enforcement Center.

In the car, defendant repeatedly urged Griffith to go to "Mint Street." When Griffith asked defendant why he was making this request, defendant responded: "I think I might have killed my aunt." Griffith then changed course slightly, followed defendant's directions, and at 12:55 a.m. arrived at the house identified by Daniels. After knocking on the back door and receiving no response, Officer Griffith entered the home. Inside, Griffith found a trail of blood beginning in a hallway.

Following the trail to a bedroom, Griffith found Crawford's lifeless body lying face down on the floor, with a cord wrapped around her neck. A wastebasket was overturned, and the carpet disturbed; the remaining contents of the house were intact.

Griffith then took defendant to the Law Enforcement Center, arriving at 1:15 a.m. After smoking a cigarette and using the bathroom, defendant was placed in a room and given a pen and paper, which he had requested. A few min-

utes later, defendant returned the paper, requesting that it be sent to the Governor. On it he had written:

Dear sir
I'm not crazy
What I did was premediated! [sic]
Time 1:42 1/18/90
John D. Daniels
I do not want a trial
I do not want my family around
I do not want news report [sic]

Shortly after receiving this letter, Griffith heard a noise in the room. He entered the room to find defendant on the floor with the drawstring from his pants around his neck. Another string was attached to a filing cabinet that was four feet, three inches high. Defendant was not injured.

At 2:00 a.m., Investigator Robert A. Holl arrived at the Center and spoke with Griffith. The two men took defendant to an interview room, and Holl left to investigate the crime scene. Holl returned between 4:30 a.m. and 4:45 a.m. Holl advised defendant of his *Miranda* rights, and at 5:05 a.m., defendant waived his rights by signing a waiver form. Holl proceeded to interview defendant. The interview, which concluded at 6:00 a.m., yielded a confession that detailed the events of the night before. After being taken to jail, defendant was committed to Dorothea Dix Hospital for two weeks. He was then returned to jail to await trial.

Dr. James Sullivan, the Mecklenburg County medical examiner and an expert in forensic pathology, performed an autopsy on Crawford. His examination revealed that Crawford had bled from the nose and mouth, her left eye was bruised, her lip was cut and bruised, and her nose was broken. There were also two contusions to her frontal scalp. There were abrasions on the sides and back of her neck and indications that the victim had been dragged. Crawford also had bruises on her right arm and hand which were consistent with defensive-type wounds.

Defendant's evidence was largely directed to showing a lack of premeditation and deliberation and an inability to understand his rights before making his confession. It tended to show as follows:

Lieutenant G.W. Bradshaw of the Mecklenburg County Sheriff's Department, the shift supervisor at the intake center on 17 and 18 January, saw defendant at 7:15 a.m. on 18 January when Holl and other officers brought defendant to the intake center. Pursuant to jail policy, Bradshaw had refused to accept defendant because of information given to Bradshaw indicating potential suicidal tendencies. Bradshaw requested that Public Defender Isabel Scott Day seek an emergency commitment of defendant to allow for a mental evaluation. Bradshaw and defendant spoke during the morning, but defendant did not always seem to understand what Bradshaw was saying. Mrs. Day spoke with defendant in Bradshaw's presence, but at times defendant did not respond to her.

Dr. William Tyson, a clinical psychologist, testified as an expert in clinical and forensic psychology. He interviewed defendant for one and one-half to two hours, administered psychological tests, and reviewed material from previous evaluations of defendant. According to Dr. Tyson, defendant had a chronic and pervasive mixed personality disorder, marked by unstable moods and behavior. Defendant was dependent on cocaine and alcohol and had a history of abusing and experimenting with drugs, including amphetamines, LSD, heroin, and tranquilizers. His substance abuse aggravated his personality disorder. As a result of these problems, defendant's emotional and social development skills were those of an eleven- or twelve-year-old child. According to Dr. Tyson, defendant's ability to think or evaluate his behavior would have been compromised to the point of being "inconsequential."

Psychiatrist John N. Bolinsky, Jr., also testified as an expert in psychiatry. Dr. Bolinsky had interviewed defendant twice and had reviewed defendant's medical records,

including records for treatment of alcoholism. Dr. Bolinsky testified that defendant had an unspecified personality disorder. Based on this disorder and defendant's chronic substance abuse, coupled with his use of alcohol and cocaine on 17 January, Dr. Bolinsky testified that defendant would have been "perhaps 'paranoid'" and extremely impulsive. According to Dr. Bolinsky, defendant's ability to form a specific intent to kill his aunt "would have been profoundly impaired, if not in essence absent." Dr. Bolinsky explained that the combination of defendant's psychological problems, his chronic substance abuse, and his substance abuse on the day of the slaying would have made defendant impulsive and paranoid, causing him to act reflexively, without thinking.

*Id.* After considering the evidence presented during the guilt phase of his trial, which was conducted in September of 1990, the jury convicted Daniels on all charges.

During the sentencing phase of the trial, the prosecution presented evidence from two witnesses. First, it offered the testimony of Dr. Cynthia White, a psychiatrist, who opined that Daniels possessed an antisocial personality disorder and that, due to extensive drug and alcohol abuse, he had developed such a tolerance for alcohol and cocaine that he could react and think while under their influence. Dr. White also concluded that Daniels killed Ms. Crawford with both premeditation and deliberation. The prosecution also recalled Dr. Sullivan, who testified concerning the trauma that Ms. Crawford had suffered before she died.

To rebut Dr. White's testimony, Daniels's counsel recalled Dr. Bolinsky, who testified that it was improbable that Daniels would have killed Ms. Crawford absent depression and substance abuse. Dr. Bolinsky explained that Daniels's substance abuse was not of the sort that leads to increased tolerance levels, and that his use of alcohol and cocaine on the day of the offenses caused him to be mentally impaired. Dr. Bolinsky concluded that Daniels's problems were treatable and that Daniels felt remorse for his actions. His counsel also presented evidence from several members of Daniels's family. Two of his siblings, John and Mary, testified that they typically noticed a

change in Daniels's personality and attitude when he was drinking. His mother testified that Daniels's personality changed markedly when he consumed alcohol, and she advised the jury that her son had expressed remorse for his crimes.

The jury recommended that Daniels be sentenced to death, and the judge accordingly imposed that penalty.[1] The court also sentenced Daniels to consecutive terms of imprisonment on his convictions for assault and for attempting to burn his dwelling, but it arrested judgment on the robbery conviction.

## B.

Daniels appealed his convictions and sentence to the Supreme Court of North Carolina.[2] On March 5, 1992, while the direct appeal was pending, Daniels also filed a Motion for Appropriate Relief (the "First MAR") in that court.[3] On July 29, 1994, the Supreme Court of North Carolina affirmed Daniels's convictions and sentence on the direct appeal.[4] *Daniels*, 446 S.E.2d at 298. Then, on August 1, 1994, the court summarily denied the First MAR. *State v. Daniels*, Order, 506A90-1 (N.C. Aug. 1, 1994). Daniels's conviction became final on January 23, 1995, when the Supreme Court of the United States denied his petition for certiorari. *Daniels v. North Carolina*, 513 U.S.

---

[1]In a capital case in North Carolina, the jury hears evidence in the sentencing phase of a trial and makes a binding recommendation to the judge. N.C. Gen. Stat. § 15A-2000(b); *see State v. McCollum*, 433 S.E.2d 144, 153 (N.C. 1993).

[2]Daniels's direct appeal bypassed the North Carolina Court of Appeals. *See* N.C. Gen. Stat. § 7A-27(a).

[3]A defendant convicted of a capital crime in North Carolina may seek post-conviction relief by way of an MAR. An MAR is not identical to a habeas corpus petition, but it provides an avenue for any attempt to obtain relief from "errors committed in criminal trials." *See* N.C. Gen. Stat. § 15A-1401.

[4]On August 25, 1994, the Supreme Court of North Carolina granted reconsideration of its decision in the direct appeal in order to correct a factual misstatement. The award of reconsideration had no impact on any of the issues Daniels raised in his direct appeal. *See State v. Daniels*, Order, 506A90 (N.C. Aug. 25, 1994).

1135 (1995). On December 29, 1995, Daniels filed a second MAR (the "Second MAR"), this time in the Superior Court of Mecklenburg County (the "Second MAR Court"). That court, however, dismissed the Second MAR on February 11, 1997, without conducting an evidentiary hearing. *State v. Daniels*, Findings of Fact and Conclusions of Law, 90 CRS 4580 (N.C. Super. Ct. Feb. 11, 1997) (the "Second MAR Decision"). Thereafter, on May 28, 1998, the Supreme Court of North Carolina denied certiorari on the Second MAR Decision. *See State v. Daniels*, 506 S.E.2d 248 (N.C. 1998).

On May 4, 1999, Daniels filed a motion for discovery, pursuant to N.C. Gen. Stat. § 15A-1415(f), in the Superior Court of Mecklenburg County (the "§ 1415(f) Proceeding"). This statute was enacted by the North Carolina legislature in 1996, and it provides that, upon timely request, a prisoner convicted of a capital crime is entitled to access to the complete files of his case from all law enforcement and prosecutorial agencies involved in his prosecution. Because Daniels had filed his Second MAR before § 1415(f) was enacted, and because the Second MAR was dismissed before Daniels filed the § 1415(f) Proceeding, the State contended that he was not entitled to any § 1415(f) relief.

On May 28, 1999, while the parties were still contesting the § 1415(f) Proceeding in state court, Daniels sought federal habeas corpus relief in the Western District of North Carolina. Thereafter, in April of 2000, the Supreme Court of North Carolina ruled that inmates convicted of capital offenses, such as Daniels, were entitled to discovery under § 1415(f). *State v. Williams*, 526 S.E.2d 655, 657 (N.C. 2000). On the basis of the *Williams* decision, the State capitulated in the § 1415(f) Proceeding. Daniels's § 1415(f) discovery was completed on January 31, 2001, and, on February 13, 2001, the parties filed a consent order in federal court authorizing Daniels to amend his habeas corpus petition. Before filing his amended petition, however, Daniels again sought relief in the Supreme Court of North Carolina, asserting that his murder conviction and death sentence were invalid under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). On February 22, 2001, the Supreme Court of North Carolina summarily denied that claim. *State v. Daniels*, Order, 506A90-3 (N.C. Feb. 22, 2001) (the "Summary Opinion").

On March 2, 2001, Daniels filed his amended petition for federal habeas corpus relief, adding his *Apprendi* claim and a false testimony claim. The *Apprendi* claim had been denied in the Summary Opinion, and Daniels's false testimony claim was premised on the evidence he had obtained in § 1415(f) discovery. In its answer to the amended petition, the State waived any exhaustion requirement on the false testimony claim,[5] and it then moved for summary judgment on all of Daniels's claims. On January 19, 2002, the district court concluded that neither an evidentiary hearing nor further discovery was necessary, and it awarded summary judgment to the State. *Daniels v. Lee*, Order, 3:99CV225MU (W.D.N.C. Jan. 19, 2002) (the "Summary Judgment Order"). Daniels then filed a motion for reconsideration of the Summary Judgment Order, which the district court denied. *Daniels v. Lee*, Order, 3:99CV225MU (W.D.N.C. April 3, 2002) (the "Reconsideration Order"). Finally, Daniels filed a timely notice of appeal from the Summary Judgment Order and the Reconsideration Order, and he now seeks issuance of a certificate of appealability and reversal of those orders.

## II.

In assessing Daniels's claims, we must adhere to the principles established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, a federal court may award habeas corpus relief with respect to a claim adjudicated on its merits in a state court proceeding only if the state court's adjudication resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court has explained, a state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v.*

---

[5]Pursuant to 28 U.S.C. § 2254(b)(1), an application for a writ of habeas corpus shall not be granted unless the applicant exhausted the remedies available to him "in the courts of the State."

*Taylor*, 529 U.S. 362, 413 (2000). A state court decision unreasonably applies clearly established federal law if it "unreasonably applies that principle to the facts of the prisoner's case." *Id.*[6]

Before a petitioner may pursue an appeal from a final order in a habeas corpus proceeding arising out of a state court conviction, a "circuit justice or judge" must issue a certificate of appealability ("COA") on the petitioner's behalf. 28 U.S.C. § 2253(c)(1). Under AEDPA, a COA "may issue . . . if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). In order to satisfy this standard, a petitioner must demonstrate to a circuit justice or judge that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).

## III.

Daniels asserts five errors in his conviction and sentence. Specifically, he contends:

> (1)   that during closing argument in the sentencing phase, the prosecution improperly referred to the Bible and incorrectly advised the jury that it would not be the ultimate decisionmaker on a death sentence (the "Closing Argument claim");
>
> (2)   that he was deprived of both his right to call a material

---

[6]Significantly, findings of fact by a state court are entitled to a "presumption of correctness," which a petitioner, such as Daniels, must rebut by "clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1). Finally, "even if the state court's determination that there is no constitutional error was 'contrary to' or 'an unreasonable application of' Supreme Court precedent, we are not permitted to grant habeas corpus relief unless we are convinced that the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

witness during the guilt phase and his right to self-representation (the "Sixth Amendment claim");

(3)   that he was unaware of his right to testify in the trial's sentencing phase and that he received ineffective assistance of counsel regarding his right to testify (the "Right to Testify claim");

(4)   that the indictment failed to make the allegations necessary for either the first degree murder conviction or the death sentence (the "Indictment claim"); and

(5)   that the State, in the sentencing phase, presented false testimony through Dr. White (the "False Testimony claim").

As in many cases involving AEDPA issues, this proceeding presents an issue of procedural default. On the Closing Argument claim, Daniels failed to object to the prosecution's closing argument during the trial's sentencing phase, and the Supreme Court of North Carolina, on direct appeal, ruled that he had thus failed to preserve any error arising from that argument. *Daniels*, 446 S.E.2d at 298. Unless Daniels can show cause and prejudice,[7] we are procedurally barred from considering his Closing Argument claim. *Davis v. Allbrooks*, 778 F.2d 168, 174 (4th Cir. 1985). By contrast, Daniels exhausted his state court remedies on his Sixth Amendment claim, his Right To Testify claim, and his Indictment claim. Those three claims are subject, in this proceeding, to the deference mandated by AEDPA for state court decisions. In particular, the Sixth Amendment claim was decided on Daniels's direct appeal to the Supreme Court of North Carolina, *see Daniels*, 446 S.E.2d at 298; his Right to Testify claim was decided by the Second MAR Court, *see* Second MAR Decision at 9-11; and his Indictment claim was decided by the Supreme Court of North Carolina in its Summary Opinion. *See* Summary Opinion at

---

[7]To show cause for a procedural default, a petitioner must demonstrate that the "factual or legal basis for [the] claim was not reasonably available" at the time of the default. *Fisher v. Angelone*, 163 F.3d 835, 845 (4th Cir. 1998) (internal citations and quotations omitted). He must also show actual prejudice resulting from his failure to timely object or present the claim. *Waye v. Townley*, 871 F.2d 18, 20 (4th Cir. 1989).

1. Finally, Daniels's fifth and final claim, the False Testimony claim, was never adjudicated on its merits in state court. Indeed, the evidence on which it is premised was only discovered by Daniels in January of 2001, when he completed discovery following the § 1415(f) Proceeding. The State, however, has waived any exhaustion requirement on the False Testimony claim. And because that claim was never adjudicated in state court, it does not trigger the deference mandate of AEDPA.

IV.

A.

Turning to our assessment of Daniels's claims, we first consider his Closing Argument claim, i.e., his assertion that the prosecution made a constitutionally defective closing argument to the jury during his trial's sentencing phase. This claim has two prongs: first, Daniels contends that the State violated his Fourteenth Amendment due process rights by improperly seeking the death penalty on the basis of quotations from the Old Testament of the Bible; and second, he maintains that the prosecution violated the Eighth Amendment by suggesting that the jury was not ultimately responsible for the imposition of the death penalty. Daniels acknowledges, as he must, that he failed to timely object to either of these alleged errors in the prosecution's closing argument. While he sought to raise these issues on direct appeal, the Supreme Court of North Carolina concluded that Daniels had failed to properly preserve either aspect of the Closing Argument claim. It therefore reviewed the record only to assess whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Daniels*, 446 S.E.2d at 319 (internal quotations and citations omitted).[8] In so doing, the court concluded that the prosecution's closing argument did not deny Daniels his due process rights.

Having failed to preserve these issues for his direct appeal, Daniels did not obtain an adjudication on the merits of his Closing Argument

---

[8]When a defendant fails to timely object and properly preserve an issue for appeal, the Supreme Court of North Carolina reviews the record for plain error. *See Davis v. Allbrooks*, 778 F.2d 168, 176 (4th Cir. 1985).

claim in state court. As a result, we are procedurally barred from considering this claim, unless Daniels can show cause and prejudice for his failure to preserve the issue by a timely objection. *See Davis*, 778 F.2d at 174 (citing *Wainwright v. Sykes*, 433 U.S. 72, 82 (1977)). A federal court is unable to consider a claim dismissed by a state court on a procedural ground, unless the petitioner shows cause and prejudice in failing to follow the relevant state procedure. *Wainwright*, 433 U.S. at 82. In *Davis*, we held that the *Wainwright* rule applies when a state court also discusses the claim on its merits, e.g., in conducting a plain error review having found a procedural default. 778 F.2d at 176; *see also Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("We have held that [a] contemporaneous objection rule . . . bars federal habeas review absent a showing of cause and prejudice. . . . Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default."). Simply put, Daniels has not made the necessary showing of cause and prejudice. Indeed, Daniels has alleged neither cause nor prejudice with respect to his failure to timely object to the prosecution's closing argument. We are therefore precluded from considering the merits of the Closing Argument claim, and we are thus unable, on this claim, to decide that Daniels has made a substantial showing of the denial of a constitutional right. Accordingly, we decline to issue a COA with respect to the Closing Argument claim.

B.

Daniels's Sixth Amendment claim has two aspects: (1) his right to call witnesses during his trial, and (2) his right to self-representation.[9] Specifically, Daniels sought to call Isabel Day, a Public Defender in Mecklenburg County, to testify during the trial's guilt phase regarding his incapacity on the night he committed the offenses for which he was convicted and sentenced. After his confession on January 18, 1990, Daniels was committed to Dorothea Dix Hospital in Raleigh,

---

[9]The Sixth Amendment provides, *inter alia*, that: "[i]n all criminal prosecutions, the accused shall enjoy the right to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The compulsory process aspect of Daniels's "Sixth Amendment claim" is also grounded in Fourteenth Amendment due process.

North Carolina. Ms. Day represented Daniels in the commitment proceeding, and she spoke with and observed him for approximately an hour before his admission to the hospital. During a pre-trial suppression hearing, Ms. Day testified regarding Daniels's mental condition on the night of the offenses. The court, however, refused to allow her to testify during the trial's guilt phase because Grady Jessup, an Assistant Public Defender who worked with Ms. Day, was one of Daniels's two trial lawyers. In seeking to enable Ms. Day to testify at trial, Mr. Jessup unsuccessfully sought to withdraw from his representation of Daniels.

Daniels raised these issues in his direct appeal to the Supreme Court of North Carolina. In deciding them, the court first considered whether Ms. Day should have been allowed to testify at trial. *Daniels*, 446 S.E.2d at 315. It began its analysis by recognizing that North Carolina's rules of professional responsibility provide that a "party's attorney or any other member of the attorney's firm ordinarily may not testify as a witness." *Id.* at 312 (citing N.C. Rules of Prof'l Conduct, R. 5.2). Further, it observed that so long as "witnesses are available who can provide the information sought, [a court can refuse to] to permit an attorney for a party to testify." *Id.* Upon reviewing the record, the court concluded that the "substance of Mrs. Day's testimony about defendant's behavior was revealed through other testimony." *Id.* Thus, the Supreme Court of North Carolina deemed Ms. Day's testimony cumulative, because adequate testimony was presented from other witnesses, and it held that there was no error in excluding it. *Id.* Finally, the court concluded that the trial judge had properly refused to permit Mr. Jessup to withdraw as counsel for Daniels. *Id.*

In this proceeding, Daniels asserts that his inability to call Ms. Day as a witness violated his Sixth Amendment right to compulsory process and that the denial of Mr. Jessup's motion to withdraw violated his right of self-representation. We will assess each aspect of the Sixth Amendment claim in turn.

1.

The Supreme Court has observed that the "right to offer testimony of witnesses . . . if necessary, is in plain terms the right to present a

defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . The right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). The right to call witnesses is not absolute, however, and it may "bow to accommodate other legitimate interests." *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973). In fact, a petitioner "cannot establish a violation of his constitutional right to compulsory process merely by showing that [the court] deprived him of their testimony. He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).

In this instance, as the Supreme Court of North Carolina observed, several witnesses had already testified during the guilt phase regarding Daniels's mental state on the evening of the offenses. They included Lieutenant Bradshaw of the Sheriff's Department, who was present when Ms. Day met with Daniels. According to the Supreme Court of North Carolina, Lt. Bradshaw "testified that defendant was '[w]ithdrawn' and just stared at the floor. He further surmised that defendant was shaking and 'possibly . . . in shock.' Bradshaw testified that defendant did not seem to understand what was being said to him and that he was unresponsive to Mrs. Day." *Daniels*, 446 S.E.2d at 318. Daniels also presented other witnesses who testified to his incapacity. Thus, because witnesses had testified regarding Daniels's mental status on the evening of the offenses, it was reasonable for the Supreme Court of North Carolina to conclude that the trial testimony he sought from Ms. Day was cumulative and not essential to his defense. *See generally United States v. Fuentes-Cariaga*, 209 F.3d 1140, 1144 (9th Cir. 2001) ("[T]he right to present a defense is fundamental, but exclusion of evidence reached constitutional proportions in *Washington* and *Chambers* only because it significantly undermined fundamental elements of the accused's defense." (internal quotations and citations omitted)); *Romano v. Gibson*, 239 F.3d 1156, 1166 (10th Cir. 2001) (denying habeas corpus relief on compulsory process claim because defendant had presented evidence on same subject as witness's proffered testimony).

2.

Daniels also maintains that the trial court's denial of Mr. Jessup's motion to withdraw as his counsel violated his constitutional right of

self-representation. Daniels correctly asserts that the Sixth Amendment right to the assistance of counsel includes the right to forego such assistance and to represent oneself. *Faretta v. California*, 422 U.S. 806, 814 (1975). In order to show a violation of the right of self-representation, however, an assertion of that right must be (1) clear and unequivocal; (2) knowing, intelligent, and voluntary; and (3) timely. *United States v. Frazier-El*, 204 F.3d 553, 558 (4th Cir. 2000).

This prong of Daniels's Sixth Amendment claim verges on being frivolous. One of Daniels's two defense lawyers, Mr. Jessup, had moved to withdraw from the trial so that Ms. Day could testify. And if the court had granted the motion, Daniels would still have been represented by his other trial attorney. Indeed, Daniels never indicated to the trial court that he had any desire to represent himself; and a fundamental part of the *Faretta* doctrine is that the defendant must clearly and unequivocally assert his right to self-representation. *See, e.g.*, *Frazier-el*, 204 F.3d at 558; *Munkus v. Furlong*, 170 F.3d 980, 983 (10th Cir. 1999); *United States v. Allen*, 789 F.2d 90, 94 (1st Cir. 1986) (holding that right of self-representation did not attach because defendant had made no indication of his desire to proceed without counsel); *Brown v. Wainwright*, 665 F.2d 607, 610 (5th Cir. 1982) ("While the right to counsel is in force until waived, the right of self-representation does not attach until asserted."). Because Daniels did not assert his right of self-representation at trial, that right cannot have been infringed in these proceedings.

### 3.

In sum, Daniels is unable, on his Sixth Amendment claim, to make a substantial showing of the denial of a constitutional right. In light of the deference we must accord the Supreme Court of North Carolina, this claim is inadequate to "deserve encouragement to proceed further." *Slack*, 529 U.S. at 484. Thus, Daniels is not entitled to a COA on either prong of his Sixth Amendment claim.

### C.

We next turn to Daniels's Right to Testify claim, which arises out of rights protected by the Sixth and Fourteenth Amendments. This claim also has two prongs: first, Daniels maintains that he was

unaware of his right to testify at his trial's sentencing phase; and second, he maintains that his lawyers were ineffective both in failing to make him aware of that right and in failing to compel him to testify. In support of this claim, Daniels asserts by affidavit that he did not know of his right to testify at the sentencing phase, and he states that he would have testified to his remorse had he known that he could do so. Further, both of Daniels's trial attorneys have stated in affidavits that, although they spoke with Daniels about testifying during the trial's guilt phase, they do not recall advising him that he was entitled to testify in the sentencing phase.

Daniels presented his Right to Testify claim to the Second MAR Court, which concluded that Daniels's "affidavits and the transcript demonstrate that [he] knew he had a fundamental right to testify [at the sentencing phase] and that he waived his right to testify by failing [to do so]." Second MAR Decision at 9. Further, the Second MAR Court found that neither "the transcript nor defendant's affidavits support a conclusion that [he] was deprived of his right to effective assistance of counsel by his counsel's advice concerning his right to testify." *Id.*

1.

It is elementary "that a defendant in a criminal trial has a constitutional right to testify on his own behalf." *United States v. McMeans*, 927 F.2d 162, 163 (4th Cir. 1992) (citing *Rock v. Arkansas*, 483 U.S. 44, 51 (1987)). And it is "the defendant who retains the ultimate authority to decide whether or not to testify." *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). In this instance, however, the Second MAR Court specifically found that Daniels was aware of his right to testify in the trial's sentencing phase, and it found that he had waived that right. And Daniels failed to present any clear and convincing evidence to rebut the presumption of correctness we must afford to such state court findings under AEDPA.

First, the record reflects that Daniels was present during the trial's voir dire proceedings when his lawyers questioned prospective jurors on how they would react if Daniels decided not to testify. Second, Daniels had initially expressed a desire to testify during the guilt phase but, after discussing the matter with his lawyers, he had decided

not to take the stand. Finally, at the outset of the trial's sentencing phase, the court advised all those present, including Daniels, as follows:

> All right, before we bring the jury in, let me say that for this phase of the trial, I have requested that the deputies leave the leg irons on Mr. Daniels. Now, even though I have requested that, that will not be displayed in the presence of the jury if Mr. Daniels decides to take the witness stand and testify.

*Id.* It was on this evidence that the Second MAR Court found that Daniels was aware of his right to testify during the entire trial, and that he had waived that right. *Id.* Other than offering general after-the-fact denials that he was unaware of his right to testify during the sentencing phase, Daniels provided the district court with no evidence to rebut the Second MAR Court's findings. Accordingly, Daniels has failed to offer any clear and convincing evidence to displace those findings. 28 U.S.C. § 2254(e)(1).

2.

The ineffective assistance of counsel prong of Daniels's Right to Testify claim is similarly unavailing. To prevail on an ineffective assistance claim, a habeas corpus petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, he must show "that counsel's performance was deficient," meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, he must show "that the deficient performance prejudiced the defense." *Id.* Daniels bases part of this claim's ineffective assistance prong on his assertion that he was unaware of his right to testify in his trial's sentencing phase. While "the burden shouldered by trial counsel [to inform defendant of right to testify] is a component of effective assistance," *Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998), Daniels was, as the Second MAR Court found, aware of his right to testify in the trial's sentencing phase. Thus, his contention that his lawyers were ineffective in failing to inform him of his right to testify must fail.

Daniels's related contention that his lawyers failed to compel him to testify in his trial's sentencing phase is similarly unavailing. In this regard, the Second MAR Court concluded that Daniels's lawyers were appropriately concerned with and aware of his right to testify. Indeed, during voir dire, his lawyers questioned potential jurors about how they might react if Daniels did not testify. As the Second MAR Court found, Daniels wanted to testify during the trial's guilt phase. Second MAR Decision at 11. His lawyers, however, warned against his taking the stand, and Daniels changed his mind and did not testify. *Id.* Finally, in order to ensure that a witness testified regarding Daniels's remorse, his lawyers called Daniels's mother to the stand in the trial's sentencing phase. She advised the jury that her son had indeed expressed remorse for his crimes. Thus, the record — particularly as reflected in the Second MAR Opinion — indicates that Daniels's lawyers made a tactical decision that Daniels should not testify in the sentencing phase. *Cf. Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002) ("[T]he advice provided by a criminal defense lawyer on whether his client should testify is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.") (internal quotations and citations omitted). Accordingly, Daniels has failed to make a substantial showing that the performance of his defense lawyers was constitutionally deficient.

3.

In sum, Daniels has failed to provide us with any basis for deeming unreasonable the Second MAR Court's finding that he was aware of his right to testify at the trial's sentencing phase. Assessing both prongs of his Right to Testify claim, we conclude that Daniels has failed to establish that it is "adequate to deserve encouragement to proceed further." *See Slack*, 529 U.S. at 484. Because he has failed to make a substantial showing of the denial of a constitutional right, Daniels is not entitled to a COA on either prong of this claim.

D.

In his Indictment claim, Daniels maintains that his murder conviction and death sentence are invalid because the state court indictment failed to allege the necessary elements of the murder offense, and because it failed to allege the aggravating factors essential to the

death penalty. He contends that the deficiencies of the indictment render his conviction and sentence unconstitutional pursuant to the Supreme Court's decisions in *Ring v. Arizona*, 122 S. Ct. 2428 (2002); *Harris v. United States*, 122 S. Ct. 2406 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Jones v. United States*, 526 U.S. 227 (1999); and *Hodgson v. Vermont*, 168 U.S. 262 (1897).[10] In January of 2001 — before *Ring* or *Harris* had been decided, but after the Supreme Court's decisions in *Apprendi*, *Jones*, and *Hodgson* — Daniels presented this claim in a habeas corpus petition to the Supreme Court of North Carolina. That court denied the claim in a summary fashion, without elaboration or explanation. *See* Summary Opinion at 1.[11]

The *Apprendi*, *Jones*, and *Harris* decisions establish the principle that, in order to pass constitutional muster, the elements of a criminal offense must be submitted to the jury and proven beyond a reasonable doubt. *See Harris*, 122 S. Ct. at 2413-14; *Apprendi*, 530 U.S. at 489-90; *Jones*, 526 U.S. at 232, 246. Further, in *Ring*, the Court held that a jury must determine the presence or absence of aggravating factors when those factors are essential to imposition of the death penalty. *See Ring*, 120 S. Ct. at 2439-44. In considering the Indictment claim, however, we must decide, pursuant to 28 U.S.C. § 2254(d)(1), whether the state court decision being challenged, i.e., the Summary Opinion, was contrary to, or an unreasonable application of, clearly established law, as determined by the Supreme Court of the United States as of the time Daniels's conviction became final.[12] *See Muhl-*

---

[10]The Indictment claim is premised on the Fifth and Fourteenth Amendments' guarantees of due process.

[11]If a state court has failed to "articulate the rationale for its decision, our review is no less deferential than it is when we review a detailed state court analysis of a petitioner's claim." *Hartman v. Lee*, 283 F.3d 190, 194 (4th Cir. 2002) (citing *Bell v. Jarvis*, 236 F.3d 149, 158, 163 (4th Cir. 2000)). We will, nevertheless, "conduct an independent review of the record and the applicable law to determine whether the *result* reached by the state court contravenes or unreasonably applies clearly established federal law." *Id.* (internal quotation and citations omitted).

[12]Under 28 U.S.C. § 2254(d)(1), we review "clearly established law, as determined by the Supreme Court of the United States . . . as of the time of the relevant state court decision." *Williams*, 529 U.S. at 378-79 (citing

*eisen v. Ieyoub*, 168 F.3d 840, 844 (5th Cir. 1999) ("[Under AEDPA, federal courts] can grant a writ of habeas corpus only if the state court's determination of law . . . violated Supreme Court precedent in existence at the time of the petitioner's conviction."). Because the principles of *Ring*, *Harris*, *Jones*, and *Apprendi* had not been clearly established when Daniels's conviction became final in 1995,[13] those decisions cannot serve as bases for invalidating either his murder conviction or his sentence.

Finally, we have held that North Carolina's short-form murder indictment does not contravene the Supreme Court's long- standing decision in *Hodgson*. *See Hartman*, 283 F.3d at 197. Thus, the Summary Opinion was neither contrary to, nor an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), and the Indictment claim does not warrant the issuance of a COA.

E.

In his final assertion of error, the False Testimony claim, Daniels contends that the prosecution knowingly presented false testimony to the jury, through one of its witnesses, Dr. White. As we noted above, Daniels failed to present this claim in any state court proceeding because he did not discover the alleged false testimony until after his

---

28 U.S.C. 2254(d)(1)). The phrase "the time of the relevant state court decision," however, "obviously refers to the time of the state court conviction being attacked . . . and not the time of the state court decision denying collateral relief from the conviction." *Williams v. Cain*, 229 F.3d 468, 475 n.6 (5th Cir. 2000). Indeed, any other interpretation would "almost completely eviscerate the previous law of non-retroactivity and would vastly expand, rather than add a new constraint on, the power of federal courts to grant habeas relief to state prisoners." *Id.* (citing *Williams v. Taylor*, 529 U.S. at 378-79).

[13]Daniels's conviction became final on January 23, 1995, when the Supreme Court denied his certiorari petition on his direct appeal. *Daniels v. North Carolina*, 513 U.S. 1135 (1995) (denying Daniels's petition for certiorari); *Satcher v. Pruett*, 126 F.3d 561, 574 (4th Cir. 1997) (observing that conviction became final when Supreme Court denied certiorari on direct appeal).

Second MAR had been denied by the Second MAR Court. Because the False Testimony claim was never adjudicated on its merits in state court, we owe no AEDPA deference to any state court findings of fact on this issue.

## 1.

The legal basis for this claim is the Fourteenth Amendment's Due Process Clause. A state "denies a defendant due process by knowingly offering or failing to correct false testimony." *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Furthermore, "[a] *Napue* claim requires a showing of the falsity and materiality of testimony." *Id.* False testimony is "material" when "'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Boyd v. French*, 147 F.3d 319, 329-30 (4th Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

## 2.

Daniels's allegation of false testimony relates solely to the evidence presented by Dr. White during the sentencing phase. Based upon her education, expertise, and prior experience as an expert witness, the court qualified Dr. White as an expert in general psychiatry with an emphasis on substance abuse. She testified that, in preparing for her court appearance, she had reviewed various materials, including Daniels's confession; his employment files; his military records; the evaluations of Daniels completed by Drs. Bolinsky, Gross, and Tyson; and the police report on Daniels's criminal activity. Dr. White testified that, prior to forming her opinions, she had interviewed Daniels's estranged wife, "some of his high school classmates[,] one of his supervisors in the service during the time that [Daniels] was in the Marines," and his former employer. Summary Judgment Order at 33. Dr. White testified that she based her opinions on the materials she had reviewed and on the interviews she had conducted. *Id.*

In support of the False Testimony claim, Daniels asserts that, just prior to trial, the prosecution sent Dr. White certain additional materials concerning Daniels's case. These additional materials included police reports, documents relating to his prior criminal record, his

Marine Corps Reserves file, and an article about violent behavior and cocaine, which the prosecution described to her as a "favorite of [Daniels's psychiatrist] Dr. Bolinsky." Two days before her appearance in the trial's sentencing phase, Dr. White arrived in Mecklenburg County. The morning after her arrival, the prosecutor left a note for a member of his staff, requesting that Dr. White do the following:

> (1)   interview Daniels's wife, Diane Daniels, and discuss photos of Daniels's and Diane's son Maurice;
>
> (2)   meet with Daniels's coworkers and supervisors and review his personnel file;
>
> (3)   ensure that Daniels's coworkers and supervisors understood that they might have to testify;
>
> (4)   interview Sergeant Tillman and Jimmy James, both acquaintances of Daniels.

The prosecutor's note observed that interviewing Sgt. Tillman was "a hassle[,] but it may be important at trial to show the basis of [Dr. White's] opinion." The note also stated that "all of this needs to be done by 2:00 p.m. [because] Dr. White may testify this afternoon."

On the basis of this note and the related events, Daniels claims that the prosecution requested that Dr. White interview the witnesses solely to bolster her credibility, and that she had already formed her opinions before the interviews. Daniels contends that Dr. White's testimony that her opinions were based in part on the interviews was thus false, and that this false testimony was prejudicial to him in the trial's sentencing phase.

Daniels also alleges that Dr. White testified falsely regarding the number of Daniels's classmates that she interviewed. Daniels asserts that Dr. White testified that she had "interviewed some of his high school classmates." The material discovered pursuant to § 1415(f), however, indicates that she interviewed only one classmate. On this basis, Daniels maintains that Dr. White falsely represented to the jury the extent of her interviews.

In our view, reasonable jurists would agree that Daniels's allegations on this issue do not "deserve encouragement to proceed further." *Slack*, 529 U.S. at 484. First, the fact that Dr. White interviewed witnesses the day before she testified fails to indicate that her opinions were not premised, in part, on those interviews. Indeed, Daniels has failed to allege or demonstrate any factual basis for his assertion that Dr. White's interviews did not assist in the development of her opinions. *See generally McCarver*, 221 F.3d at 597-98 (denying COA because petitioner failed to allege facts that would aid his claims).

Second, Daniels's allegation that Dr. White testified as to the specific number of classmates she had interviewed is spurious. Although she testified that she had interviewed some of his "classmates," she later testified — still on direct examination — that she premised her opinions in part on her "interview with the high school classmate." Had there been any possibility of confusion, it was eliminated when Dr. White corrected herself.

Thus, Daniels has failed to make a substantial showing of the denial of a constitutional right on his False Testimony claim. We therefore decline to issue a COA on this claim.

V.

For the foregoing reasons, we are unable to issue a certificate of appealability on any of Daniels's claims, and we must dismiss his appeal.

*CERTIFICATE OF APPEALABILITY*

*DENIED AND APPEAL DISMISSED*