**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BEVERLY ANNE MONROE,
        *Petitioner-Appellee,*

v.

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
        *Respondent-Appellant.*          No. 02-6548

VIRGINIA TRIAL LAWYERS
ASSOCIATION,
        *Amicus Curiae.*

BEVERLY ANNE MONROE,
        *Petitioner-Appellant,*

v.

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
        *Respondent-Appellee.*          No. 02-6625

VIRGINIA TRIAL LAWYERS
ASSOCIATION,
        *Amicus Curiae.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-98-254-3)

Argued: December 3, 2002

Decided: March 26, 2003

Before WILKINSON and KING, Circuit Judges, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

---

Affirmed in part and dismissed in part by published opinion. Judge
King wrote the opinion, in which Judge Wilkinson and Judge Good-
win joined.

---

## COUNSEL

**ARGUED:** John H. McLees, Jr., Senior Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for
Appellant. Stephen Atherton Northup, TROUTMAN SANDERS,
L.L.P., Richmond, Virginia, for Appellee. **ON BRIEF:** Jerry W. Kil-
gore, Attorney General of Virginia, Stephen R. McCullough, Assis-
tant Attorney General, OFFICE OF THE ATTORNEY GENERAL,
Richmond, Virginia, for Appellant. George A. Somerville, TROUT-
MAN SANDERS, L.L.P., Richmond, Virginia; Frederick R. Gerson,
ROBINSON, CARL & GERSON, Richmond, Virginia, for Appellee.
David B. Hargett, HARGETT & WATSON, P.L.C., Richmond, Vir-
ginia; James O. Broccoletti, ZOBY & BROCCOLETTI, P.C., Nor-
folk, Virginia, for Amicus Curiae.

---

## OPINION

KING, Circuit Judge:

In March of 1992, wealthy art collector and notorious philanderer
Roger de la Burde died from a single gunshot wound to the head. Fol-
lowing a high-profile trial in Powhatan County, Virginia, his longtime
girlfriend Beverly Monroe was convicted of his murder. Monroe later
discovered a wealth of exculpatory evidence that the prosecution had
suppressed, including impeachment material, leads implicating other
suspects, official documents labeling Burde's death a suicide, and
statements suggesting that Burde may have been suicidal. On the

basis of this new information, Monroe claimed that the prosecution had violated her due process rights, pursuant to the principles established by *Brady v. Maryland*, 373 U.S. 83 (1963).

After unsuccessful state court proceedings, Monroe petitioned for a writ of habeas corpus in the Eastern District of Virginia. Following discovery in the federal proceedings, the district court granted the writ, concluding that the prosecution had suppressed material, exculpatory evidence. *Monroe v. Angelone*, No. 3:98CV254, Memorandum Opinion (E.D. Va. Mar. 28, 2002) (the "Habeas Opinion"). The Commonwealth[1] has appealed the court's award of habeas corpus relief, and Monroe has cross-appealed, challenging the court's conclusion that she procedurally defaulted certain aspects of her *Brady* claim.[2] Because the *Brady* evidence[3] on which the court relied is sufficient to warrant its award of habeas corpus relief, we affirm without deciding the procedural default issue.

---

[1]For ease of reference, we use the term "Commonwealth" to refer to the Director of the Virginia Department of Corrections (the nominal defendant in this appeal) and the Commonwealth's Attorney for Powhatan County (whose office prosecuted Monroe).

[2]In her cross-appeal, Monroe also contends that the prosecution did not present sufficient evidence to support her first-degree murder conviction. The Virginia courts rejected Monroe's sufficiency of evidence claim, and the district court decided that this adjudication was neither "contrary to" nor "an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1); Habeas Opinion at 66. Because the district court's resolution of this claim is not "debatable amongst jurists of reason," we decline to issue a certificate of appealability on this aspect of the cross-appeal. *Miller-El v. Cockrell*, 123 S. Ct. 1029, 1039 (2003).

[3]For ease of reference, we at times refer to undisclosed, exculpatory material as "*Brady* evidence." We do so with the understanding that a prosecutor is obliged to disclose any material favorable to an accused even if it could not have been introduced as independent *evidence* of innocence. Further, by referring to material as "*Brady* evidence," we are not implying that the prosecution committed a *Brady* violation in failing to disclose it; a *Brady* violation requires the suppression of exculpatory material to have affected the outcome of the trial. *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Finally, we do not suggest, by speaking of the "suppression" of exculpatory evidence, that the Commonwealth acted in bad faith.

This murder prosecution was closely contested, and the Commonwealth's evidence of premeditation and malice, essential elements of first-degree murder in Virginia, was particularly sparse. In attempting to portray Monroe as a cold-blooded, calculating killer, the Commonwealth relied primarily on the testimony of Zelma Smith, who told the jury that Monroe sought to obtain an untraceable handgun about a year before Burde's death. Significantly, the Commonwealth suppressed several evidentiary items that would have severely damaged the credibility of this crucial witness. The suppression of this *Brady* evidence undermines our confidence in the verdict, and there is a reasonable probability that, had the prosecution properly disclosed exculpatory material, the jury would not have convicted Monroe of first-degree murder.

I.

A.

In the early morning hours of March 5, 1992, Monroe and Joe Hairfield, Burde's groundskeeper, discovered Burde's body lying on a couch in the main house of his Powhatan County estate. Burde had died from a single gunshot wound to his forehead, the shot having been fired from his own handgun. The Powhatan County Sheriff's Office and Medical Examiner originally treated Burde's death as a suicide, and very little evidence was collected from the scene. The State Police, however, soon began to suspect foul play, and the ensuing investigation focused exclusively on Monroe.

During his lifetime, Burde held himself out as descended from Polish royalty, and he had gained notoriety for his rumored wealth, his art collection, and his promiscuity. He was reputed to be a ruthless businessman who had amassed a substantial fortune through unorthodox business deals. He had worked for a number of years as a chemist at Philip Morris Incorporated ("Philip Morris"), but after the company forced him into retirement, he concentrated on his real estate investments and his collection of African art. As part of his livelihood, Burde ran a horse farm on his sprawling estate, which was known to local residents as "Windsor."

Monroe had been involved in a romantic relationship with Burde for approximately thirteen years before his death, and she had been

with him on the evening of March 4, 1992. Although Burde had affairs with other women, Monroe had been his primary girlfriend in the years prior to his death. In 1992, Monroe was fifty-four years old. She held a masters degree in organic chemistry, and she had been employed for more than ten years in the patent department of Philip Morris. Monroe had close relationships with her three children, whom she had raised after her 1981 separation (and subsequent divorce) from Stuart Monroe. In 1992, Beverly Monroe lived with her adult son, Gavin, approximately thirteen miles from Windsor, and her daughters, Shannon and Katie, visited frequently.

B.

1.

At Monroe's trial in the Circuit Court of Powhatan County, the Commonwealth introduced evidence that Burde had affairs with other women, that Monroe stood to gain financially from Burde's death, and that Monroe had made inconsistent statements about whether she was present when Burde committed suicide. Further, the Commonwealth offered the testimony of Smith, a multiple felon, who stated that ten months prior to Burde's death, Monroe, identifying herself as "Ms. Nelson," had offered her $800 for an untraceable handgun. The Commonwealth also sought to establish that Burde was upbeat and happy prior to his death and would not have committed suicide. Finally, the Commonwealth presented forensic evidence suggesting that it was unlikely that Burde had shot himself.

In her defense, Monroe presented two alternate explanations of Burde's death, both of which supported her acquittal. First, she sought to show that Burde had committed suicide. Along these lines, witnesses testified to his precarious mental state, describing him as narcissistic and controlling, cruel and abusive to those around him, prone to obsessive and paranoid behavior, and depressed in the weeks and months prior to his death. The evidence showed that Burde's mother had attempted suicide and that Burde himself had discussed suicide in the past. Furthermore, Monroe contended that Burde had reason to be suicidal. For example, he was in danger of being exposed as a fraud in his art dealings, and he was worried about his health. Second, Monroe attempted to show that Burde had many enemies, any one of

whom could have killed him. The list of potential suspects included his jilted girlfriends, their husbands, and Burde's children.

In addition to offering alternate explanations for Burde's death, Monroe sought to convince the jury that she was incapable of committing the murder. She testified in her own defense, maintaining that she had not been present when Burde died and that any of her statements to the contrary had been coerced. According to Monroe, she loved Burde, accepted his imperfections, and would never have killed him. Indeed, Monroe was, by all accounts, a calm, gentle, and kind person, and she had an impeccable reputation as an honest and law-abiding citizen. According to numerous witnesses, she had been distraught in the weeks and months following Burde's death. Monroe also presented the jury with alibi evidence, in the form of a receipt and a neutral eyewitness, placing her in a grocery store miles from Windsor around the time of Burde's death.

On November 2, 1992, after a seven-day trial, the jury convicted Monroe of first-degree murder and use of a firearm in the commission of a felony. On December 22, 1992, she was sentenced to twenty years in prison for the murder conviction and an additional two years for the firearm conviction.[4]

2.

On direct appeal to the Court of Appeals of Virginia, Monroe primarily contended that her statements to authorities were admitted at trial in violation of her Fifth and Sixth Amendment rights. Among other claims, she maintained that the trial court erred in admitting the testimony of Zelma Smith because the prosecution had violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose material that would have undermined Smith's credibility.[5] On this point, Monroe asserted that the prosecution had withheld

---

[4]Unless otherwise noted, we refer only to Monroe's conviction for first-degree murder, with the understanding that her firearm conviction is tied to the murder conviction.

[5]Pursuant to the Supreme Court's decision in *Brady*, due process requires that a prosecutor disclose material in the Government's posses-

evidence that it had agreed not to prosecute Smith on a firearms offense in exchange for her testimony against Monroe (the "Smith gun deal").

On May 2, 1995, the Court of Appeals affirmed Monroe's conviction, concluding, *inter alia*, that the prosecution's suppression of the Smith gun deal was immaterial. *Monroe v. Virginia*, No. 2604-92-2, Memorandum Opinion (Va. Ct. App. May 2, 1995) ("*Monroe I*"). Six months later, in a summary opinion issued on November 1, 1995, the Supreme Court of Virginia refused to grant Monroe's petition for appeal. *Monroe v. Virginia*, No. 951346 (Va. Nov. 1, 1995).

3.

On April 7, 1997, after an unsuccessful direct appeals process, Monroe filed a habeas corpus petition in the Supreme Court of Virginia, raising numerous challenges to her conviction. First, she contended that she had received ineffective assistance of counsel. Second, she asserted, once again, that her statements to the authorities had been introduced in violation of *Miranda* and her Sixth Amendment right to counsel. Finally, she maintained that her conviction had been obtained in violation of her due process rights, because of a tainted investigation, prosecutorial misconduct, and the Commonwealth's violation of *Brady* by its suppression of exculpatory evidence.

In support of her *Brady* claim, Monroe pointed to nine separate items of suppressed, exculpatory material: (1) the Smith gun deal; (2) the Commonwealth's agreement to help Smith obtain a reduction of an unrelated sentence (the "Smith sentence deal"); (3) Smith's history as an informant ("Smith's informant history"); (4) the identity of witnesses who had seen a dark Bronco/Blazer vehicle speeding from Windsor around the time of Burde's death (the "Bronco witnesses");

---

sion that is favorable to an accused. The remedy for a *Brady* violation does not (contrary to what Monroe asserted on direct appeal) normally require the exclusion of a witness's testimony. Instead, a *Brady* violation usually entitles a defendant to a new trial. *See Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 562 (4th Cir. 1999).

(5) the full results of gunshot residue tests (the "residue tests"); (6) the medical records of Krystyna Drewnowska ("Krystyna"), one of Burde's girlfriends, who was pregnant with his child when he died ("Krystyna's medical records");[6] (7) a statement by Windsor grounds-keeper Joe Hairfield that he had moved the gun when he found Burde's body ("Hairfield's statement"); (8) a medical examiner's report (the "missing examiner's report"); and (9) the source of a letter written by Monroe and used to pressure her in a pre-trial police inter-view (the "inculpatory letter source").

On October 29, 1997, Monroe moved in the Supreme Court of Virginia for discovery to search for other exculpatory material that the prosecution may have suppressed. Further, on November 20, 1997, Monroe sought to amend her state habeas corpus petition to include claims based on evidence she had discovered through an independent investigation. In particular, Monroe had obtained evidence that the Commonwealth had suppressed three other items of exculpatory material:

> (1)   a March 5, 1992, report made by Dr. Brown of the Medical Examiner's office, which indicated that, based on his examination of Burde's body at Windsor, he concluded that Burde's death was a suicide ("Dr. Brown's first report");

> (2)   a laboratory request made by Dr. Jefferson, the physician in the Medical Examiner's office who conducted Burde's autopsy, labeling Burde's death a suicide ("Dr. Jefferson's notes"); and

> (3)   evidence that Burde's ex-wife, Dr. Brigitte Burde, had advised the Medical Examiner's office that Burde had been experiencing personal problems and taking Librium, an anti-depressant medication (the "anti-depressant disclosure").

---

[6]Krystyna's medical records show that she had scheduled an abortion for March 11, 1992, just days after Burde's death. She cancelled this appointment once Burde was dead.

These items came to light through a Freedom of Information Act request to the Powhatan County Medical Examiner after the conclusion of Monroe's trial (the "FOIA request").

In its order of January 29, 1998, the Supreme Court of Virginia dismissed Monroe's habeas corpus petition and refused, without explanation, to authorize either additional discovery or Monroe's proposed amendment. *Monroe v. Dir. of the Dep't of Corr.*, No. 970666 (Va. Jan. 29, 1998) ("*Monroe II*"). In dismissing the petition, the court ruled that most of Monroe's claims had been defaulted, pursuant to *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1974), because they had not been raised at the earliest opportunity. As for the claims Monroe had preserved, the court ruled that Monroe was not entitled to any relief.

4.

On April 27, 1998, following her unsuccessful state proceedings, Monroe sought habeas corpus relief in the Eastern District of Virginia. Her federal petition largely reiterated the claims she had asserted in her petition to the Supreme Court of Virginia, although she no longer relied, at least for the purposes of her *Brady* claim, either on the Commonwealth's failure to disclose Krystyna's medical records[7] or on the inculpatory letter source. She also replaced the missing examiner's report with Dr. Brown's first report. Furthermore, her federal petition included other material obtained through the FOIA request, specifically Dr. Jefferson's notes and the anti-depressant disclosure. In response, the Commonwealth moved to dismiss her petition, asserting that, under the principles of *Slayton*, Monroe had procedurally defaulted most of her claims.

On April 26, 1999, the district court dismissed certain aspects of Monroe's *Brady* claim, agreeing with the Commonwealth that they had been defaulted. *Monroe v. Angelone*, No. 3:98CV254, Memorandum (E.D. Va. Apr. 26, 1999) (the "Default Opinion"). In particular, the court concluded that Monroe had defaulted her right to rely on the

---

[7]In her federal petition, Monroe used Krystyna's medical records to support an ineffective assistance of counsel claim, asserting that, although the records had been disclosed, Monroe's trial counsel never took advantage of them.

following exculpatory material: (1) Dr. Brown's first report; (2) Dr. Jefferson's notes; (3) the anti-depressant disclosure; (4) the residue tests; and (5) Hairfield's statement. *Id.* at 9-20.[8] The court also ruled, however, that Monroe was entitled to rely on other *Brady* evidence, including: (1) the Smith gun deal; (2) the Smith sentence deal; (3) Smith's informant history; and (4) the Bronco witnesses.[9] *Id.* at 20. In its Default Opinion, the court also granted Monroe's motion for discovery with respect to her remaining claims. *Id.* at 21-26.

Over the next year, from April of 1999 until July of 2000, Monroe conducted discovery in search of additional *Brady* material. As part of this effort, she deposed Smith; Deputy Sheriff Gregory Neal of the Powhatan County Sheriff's Office; Special Agent David Riley of the Virginia State Police; Corinna de la Burde Pugh ("Corinna"), Burde's youngest daughter; Deborah Pollock, a secretary in the Sheriff's Office who had observed some part of Riley's interview of Monroe on March 26, 1992; and Patricia Dilettoso Fisher, another secretary who had observed the same interview. These discovery efforts revealed three other categories of suppressed, exculpatory evidence.

First, the prosecution had failed to provide Monroe's defense with some of Riley's notes on Smith ("Riley's notes"). Riley's notes established that the Commonwealth knew of, but withheld, evidence of

---

[8]In addressing the exculpatory material obtained through the FOIA request — Dr. Brown's first report, Dr. Jefferson's notes, and the anti-depressant disclosure — the district court concluded that these materials were available to Monroe's defense at trial, reasoning that Monroe could have made an earlier FOIA request. Default Opinion at 13. Further, the court questioned whether the Commonwealth was responsible, under *Brady*, for records of the Powhatan County Medical Examiner. *Id.* For these reasons, the court concluded that the documents obtained through the FOIA request had either been defaulted or did not provide a basis for relief. *Id.* at 14. We do not reach these issues, and we draw no conclusions about the court's procedural default ruling.

[9]The district court concluded that these four items had not been defaulted because a state court addressed, on its merits, Monroe's *Brady* claim based on each of these items of exculpatory evidence. *See Monroe I* at 11 (denying *Brady* claim, on its merits, based on Smith gun deal); *Monroe II* at 1 (same for claim based on Smith sentence deal, Smith's informant history, and the Bronco witnesses).

Smith's history as an informant. The notes also revealed that Smith had made statements inconsistent with her trial testimony ("Smith's inconsistent statements"),[10] and that Smith had advised Riley that her former employer, Eric Lundy, had provided her with the handgun she offered to sell to Monroe (the "Lundy information"). Strikingly, Riley did not contact or interview Lundy because, according to Riley, he assumed that Lundy would deny Smith's allegations and contradict her testimony. Lundy's denial, however, would have supported Monroe's defense by impeaching Smith's credibility.[11]

Second, Monroe found that the prosecution had failed to disclose Deputy Neal's notes regarding certain statements made by prosecution witnesses. These included:

(1) a statement by Barbara Samuels, Burde's secretary, that "the recent past had been hard for Burde due to personal problems" ("Samuels's personal problems statement");

(2) Samuels's statement that Burde's usual napping position was "on his back with his hands on his head" and that he always napped on the sofa opposite from the one on

---

[10]According to Riley's notes, Smith advised him that she recognized Monroe from a picture appearing in a newspaper in June of 1992. At trial, however, Smith denied learning of Monroe's case from a newspaper, testifying that she read something about it in *People* magazine. Riley's notes also suggest that Smith had altered her story on who had answered the phone when she called for Ms. Nelson: at trial, she said that a man answered the phone, but according to Riley's notes, she stated that a woman answered the phone. Somewhat independently, Riley's notes indicate that he used a circumspect investigative procedure, namely, he asked Smith to confirm her identification of Monroe out of a lineup of photographs that included the newspaper photo from which Smith originally recognized Monroe.

[11]Sure enough, Lundy, in April of 2000 (after Monroe's defense learned of the Lundy information), confirmed by affidavit that "I never during 1991 or at any other time supplied Zelma Sanderlin Mann Smith with a firearm of any type. I know nothing about Ms. Smith trying to obtain or obtaining a .357 Magnum or any other type of firearm at any time during 1991."

which he was found ("Samuels's napping habits statement");[12] and

    (3)   Corinna's statement that Krystyna was afraid to take a test to determine the sex of her baby because Burde would not want a baby girl ("Corinna's male heir statement").

Deputy Neal had taken each of these statements in the days following Burde's death, and they support the proposition that Burde was killed either by his own hand or by someone other than Monroe.

    Finally, Monroe discovered that the Commonwealth had failed to disclose notes taken by two secretaries who watched Riley interview Monroe on March 26, 1992 (the "secretaries' notes"). During the interview, Riley questioned Monroe about the evening of Burde's death, eventually leading her to acknowledge a vague recollection of being present when Burde committed suicide. Riley did not record this interview, but he had two secretaries, Ms. Pollock and Ms. Dilettoso, take notes from an observation room behind a one-way mirror.[13] The secretaries' notes corroborate Monroe's testimony that Riley had manipulated her, and they would have been helpful to Monroe's defense in cross-examining prosecution witnesses who testified about the interview.

    On June 27, 2000, the district court referred Monroe's petition to a magistrate judge, pursuant to 28 U.S.C. § 636(b), "for all purposes, including the handling of all pretrial motions, and for an evidentiary hearing if necessary." *Monroe v. Angelone*, No. 3:98CV254, Order

---

[12]Samuels's napping habits statement would have assisted Monroe's defense because it contradicts the prosecution's theory that Burde was shot while he was napping. Burde was found on his right side on a couch in his library. Samuels suggested that Burde napped on his back with his hands behind his head and on a different couch, opposite from the one on which his body was found.

[13]At the very end of the interview, Riley activated a recording device and recorded the last few minutes. The recording reflects Monroe's repeated statements that she could not remember the night of Burde's death, and it indicates that Riley sought to induce Monroe to accept his version of Burde's death.

(E.D. Va. June 27, 2000). Soon thereafter, Monroe successfully moved to amend her petition to include the new information obtained during discovery. In response, the Commonwealth moved for summary judgment, and Monroe filed a cross-motion for summary judgment and an opposition to the Commonwealth's motion. In December of 2000, the magistrate judge conducted a two-day hearing on Monroe's petition.[14] On April 18, 2001, he issued his Report and Recommendation to the district court, recommending that Monroe's petition be denied. *Monroe v. Angelone*, No. 3:98CV254, Magistrate's Report and Recommendation (E.D. Va. April 18, 2001) (the "Report").

Monroe filed timely objections to the Report, urging the court to reject the magistrate judge's recommendation and to issue a writ. On September 17, 2001, the court conducted a hearing on Monroe's objections to the Report, and it issued its Habeas Opinion on March 28, 2002. In the Habeas Opinion, the court awarded Monroe a writ of habeas corpus because of the prosecution's failure to disclose exculpatory evidence, including: (1) the Smith gun deal; (2) the Smith sentence deal; (3) Smith's informant history; (4) Smith's inconsistent statements; (5) the Lundy information; (6) Samuels's personal problems statement; (7) Samuels's napping habits statement; (8) Corinna's male heir statement; (9) the secretaries' notes; and (10) the Bronco witnesses. Habeas Opinion at 48-62. In assessing the collective effect of the prosecution's suppression of this evidence, as it was required to do by the Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419 (1995), the court concluded that the Commonwealth had violated established *Brady* principles. Habeas Opinion at 60-62.

After granting Monroe a writ of habeas corpus, the court stayed its order pending appeal and released Monroe on bond. The Commonwealth has filed a timely notice of appeal from the Habeas Opinion, and Monroe has cross-appealed. We possess jurisdiction over the court's decision to award habeas corpus relief pursuant to 28 U.S.C. § 1291.

---

[14]At the evidentiary hearing, the magistrate judge heard evidence on two issues: the voluntariness of Monroe's inculpatory statements and the Commonwealth's suppression of exculpatory evidence.

## II.

## A.

In its appeal, the Commonwealth maintains that the district court failed to give proper deference to the state court adjudications of Monroe's *Brady* claim, as required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[15] Under AEDPA, a federal court must defer to a state court's resolution of a claim that has been "adjudicated on the merits." 28 U.S.C. § 2254(d). Conversely, where a state court has not considered a properly preserved claim on its merits, a federal court must assess the claim de novo.[16] *Daniels v. Lee*, 316 F.3d 477, 487 (4th Cir. 2003); *see also Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) ("[AEDPA] applies only when there is an antecedent state court decision on the same matter.").

Pursuant to this doctrine, AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on *Brady* material that has surfaced for the first time during federal proceedings. *Rojem v. Gibson*, 245 F.3d 1130, 1140 (10th Cir. 2001) (reviewing *Brady* claim de novo when exculpatory material surfaced for first time in federal habeas proceedings); *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 2635 (2002) (same); *see also Cargle*, 317 F.3d at 1206-07 (holding that AEDPA's standard of review does not apply when new issues are considered on

---

[15]Under AEDPA, a state court judgment may be overturned on federal habeas review only if it: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

[16]If, however, the state court declined to adjudicate a claim on its merits because "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner" can either (1) satisfy the cause and prejudice standard, or (2) demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

federal habeas review); *Daniels*, 316 F.3d at 487 (suggesting that when "evidence on which [a federal claim] is premised was only discovered [after the conclusion of state court proceedings,] it does not trigger the deference mandate of AEDPA"); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("AEDPA deference does not apply to [a] claim [when] [e]vidence of the [claim] was adduced only at the hearing before the [federal] magistrate judge.").

Here, certain items of suppressed, exculpatory material first came to light during Monroe's federal habeas proceedings. In particular, Monroe first obtained the following through discovery in federal court: (1) some evidentiary material on the Smith sentence deal (particularly Riley's deposition); (2) some evidentiary material on Smith's informant history (particularly information in Riley's notes); (3) Smith's inconsistent statements; (4) the Lundy information; (5) Samuels's personal problems statement; (6) Samuels's napping habits statement; (7) Corinna's male heir statement; and (8) the secretaries' notes.[17] By contrast, the state courts have previously considered: (1) the Smith gun deal; (2) some evidentiary material on the Smith sentence deal; (3) some evidentiary material on Smith's informant history; and (4) the Bronco witnesses. In these circumstances, we are obliged to give deference to decisions of the state courts that the Commonwealth's failure to disclose these last four items of *Brady* evidence did not constitute a *Brady* violation.

The prosecution's late disclosure of the other eight items of exculpatory material listed above, however, precluded the state courts from considering those items when they ruled on Monroe's *Brady* claim. Because no state court was ever presented with these eight items of exculpatory material, we are obliged to make an independent determination of whether they are favorable to Monroe, and whether they were suppressed. *Daniels*, 316 F.3d at 487; *see also Boyette v. Lefevre*, 246 F.3d 76, 89 (2d Cir. 2001) ("[B]ecause no state court determined whether some documents were *Brady* materials, we must

---

[17]Because Monroe was entitled "to rely on . . . the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials," she did not default her right to rely on the material first obtained in federal habeas discovery by failing to bring it to the attention of the state courts. *Strickler*, 527 U.S. at 284.

exercise *de novo* review of this issue."). In addition, we must determine whether all of the non-defaulted materials — those presented in state court and those presented for the first time in federal court — considered and weighed collectively, made a material difference to the outcome of Monroe's trial. *Kyles*, 514 U.S. at 436-37; *Cargle*, 317 F.3d at 1206-07.

In making this "materiality" determination, the third step in any *Brady* analysis, we are unable to accord AEDPA deference on an item-by-item basis to the four items of exculpatory material considered in state court, because we are obliged to assess the materiality of exculpatory evidence "collectively, not item by item."[18] *Kyles*, 514 U.S. at 436; *see also Cargle*, 317 F.3d at 1206-07 (holding that AEDPA does not apply to cumulative error analysis when no state court has considered all the material considered by federal courts). In these circumstances, we have no way of deferring to an earlier state court adjudication on materiality because no state court considered all of the *Brady* material presented here. As a result, we must make an independent assessment of whether the suppression of exculpatory evidence — including the evidence previously presented to the state courts — materially affected Monroe's first-degree murder conviction.[19]

---

[18]By contrast, we would accord item-by-item deference to a state court determination that material was not exculpatory or had not been suppressed. *See Rojem*, 245 F.3d at 1139-40 (according deference item by item to state court decision that evidence was not exculpatory); *see also Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (holding that state finding on suppression was entitled to presumption of correctness). The state courts, however, to the extent they explained their reasoning, rejected Monroe's *Brady* claim based on materiality. *Monroe I* at 11.

[19]The fact that we are weighing *all* of the suppressed evidence in assessing materiality may raise the concern that a federal habeas petitioner will be afforded de novo review of a *Brady* claim (already considered by a state court) whenever a scintilla of new exculpatory material comes to light in federal proceedings. To the contrary, we continue to defer to state court decisions that relief would not be warranted on the basis of the *Brady* evidence that those courts considered. Thus, if a petitioner's discovery in federal court is minor, it will be unlikely to tip the analysis in favor of relief; the newly discovered evidence would have to be the proverbial straw that broke the camel's back.

## B.

In our consideration of the district court's judgment, we review legal conclusions de novo and findings of fact for clear error. *See Quesinberry v. Taylor*, 162 F.3d 273, 276 (4th Cir. 1998). Although the magistrate judge, rather than the district court, conducted the evidentiary hearing on Monroe's petition, we review the district court's findings, rather than the magistrate judge's recommendations. *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988); *see also Wimmer v. Cook*, 774 F.2d 68, 73 (4th Cir. 1985) ("[W]hile . . . the magistrate may conduct the evidentiary hearing in the case, he lacks judicial authority to make on his own a final determination."); *cf. United States v. Raddatz*, 447 U.S. 667, 683 (1980) (holding that district court is ultimate decisionmaker).

## III.

The prosecution's failure to disclose evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Moreover, the prosecutor's duty encompasses both impeachment material and exculpatory evidence, and it includes material that is "known only to police investigators and not to the prosecutor." *Kyles*, 514 U.S. at 438. Along these lines, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf." *Id.* at 437. Significantly, a *Brady* violation has three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, i.e., it must have

---

Further, it may be suggested that we are encouraging defendants to make a less-than-vigorous effort to uncover *Brady* material during state proceedings. However, AEDPA guards against any strategic decision to wait to search for *Brady* material: a federal habeas petitioner may only secure an evidentiary hearing if he has been fully diligent in state court. 28 U.S.C. § 2254(e)(2). Thus, in considering this *Brady* material collectively, we neither free defendants from the effects of state adjudication, nor encourage them to be lax in their state court efforts.

prejudiced the defense at trial. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

As explained below, the suppressed evidence on which the district court relied in awarding habeas corpus relief establishes a *Brady* violation, which renders it unnecessary for us to reach the issue of procedural default raised by Monroe in her cross-appeal. To be clear, we are considering only the following evidence (the "Habeas Evidence") in our assessment of Monroe's *Brady* claim:

(1)    the Smith gun deal;

(2)    the Smith sentence deal;

(3)    Smith's informant history;

(4)    Smith's inconsistent statements;

(5)    the Lundy information;

(6)    Samuels's personal problems statement;

(7)    Samuels's napping habits statements;

(8)    Corinna's male heir statement;

(9)    the secretaries' notes; and

(10)   the Bronco witnesses.

In light of the foregoing, we turn to whether the Habeas Evidence establishes the three essential elements of a *Brady* violation, as articulated by the Supreme Court in *Strickler v. Greene*.

A.

First, we agree with the district court that each item of Habeas Evidence was favorable to Monroe. Most, if not all, of the Habeas Evidence could have been used to impeach prosecution witnesses. In

particular, the prosecution failed to disclose five separate items of impeachment material on its key witness, Zelma Smith, including: (1) the Smith gun deal; (2) the Smith sentence deal; (3) Smith's informant history; (4) Smith's inconsistent statements; and (5) the Lundy information.[20] Similarly, the statements given to Deputy Neal — including Samuels's personal problems statement, Samuels's napping habits statement, and Corinna's male heir statement — could have been used to impeach other prosecution witnesses.[21] Along similar lines, the secretaries' notes would have been helpful in cross-examining prosecution witnesses who testified about the March 26, 1992, interview. Finally, the Bronco witnesses — had their identities been disclosed — could have been called to testify that they had observed a suspicious vehicle speeding away from Windsor about the time of Burde's death.[22] Thus, each item of Habeas Evidence was favorable to Monroe's defense.

### B.

The second element of a *Brady* violation requires us to determine whether the prosecution suppressed the Habeas Evidence. As the Supreme Court has pointed out, suppressed evidence is "information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). Initially,

---

[20]The prosecution contends that the Lundy information was merely an investigative lead. To the contrary, Riley admitted that he assumed Lundy would contradict Smith's trial testimony. Thus, the Commonwealth had an obligation to disclose the Lundy information, regardless of whether a prosecutor has an independent duty to seek out exculpatory evidence to assist an accused. *See East v. Scott*, 55 F.3d 996, 1003-04 (5th Cir. 1995).

[21]Samuels's statements contradicted Corinna's trial testimony. Similarly, Corinna's male heir statement could have been used to challenge Krystyna's testimony that Burde was indifferent to the sex of the baby.

[22]Even though the information provided in the Bronco tip was somewhat vague, the Bronco witnesses would have testified that a Bronco-like vehicle was speeding away from Windsor at about the time of Burde's death, making it more than a "remote possibility that [disclosure] would have helped the defense." *United States v. Polowichak*, 783 F.2d 410, 414 (4th Cir. 1986).

the Commonwealth insisted that the identity of the Bronco witnesses was disclosed to Monroe's defense before trial, but it has now dropped this contention, admitting that "[t]he fact of this report was disclosed to the defense in discovery, but the Johnson's [sic] identity apparently was not." Appellant's Br. at 27. In any event, the district court found that the identity of the Bronco witnesses was not disclosed, Habeas Opinion at 49, and its finding on this point is not clearly erroneous.

The Commonwealth provides two explanations for its failure to disclose the remaining nine items of Habeas Evidence. First, it contends that the prosecutors did not believe the material had independent exculpatory value. In other words, for most of the Habeas Evidence, the Commonwealth asserts that "the substantive equivalent was put before the jury by the Commonwealth's witnesses." Appellant's Br. at 45; *see also id.* at 56. However, the disclosure obligation attaches irrespective of the good faith of the prosecutors. *Brady*, 373 U.S. at 87. Further, the prosecution has a duty to disclose material even if it may seem redundant. Redundancy may be factored into the materiality analysis, but it does not excuse disclosure obligations.

Second, the Commonwealth vigorously contests whether some of the Habeas Evidence existed. In particular, the Commonwealth asserts that it did not agree to help Smith secure a sentence reduction. It also contends that Smith did not have a history of providing information to police prior to testifying against Monroe, and that even if she did, the prosecutors were not aware of this history. Contrary to the Commonwealth's contentions, the district court found that the prosecutors had agreed to assist Smith obtain a sentence reduction and that they were aware that Smith had provided information in prior investigations. Habeas Opinion at 63. Because these findings are not clearly erroneous,[23] we must adhere to the district court's decision that the Smith

---

[23]The court was entitled to conclude that Riley's notes and Riley's deposition establish that the Commonwealth knew of Smith's informant history. Habeas Opinion at 54. Similarly, the record amply supports the court's finding of the Smith sentence deal. First, Riley indicated in his deposition that "[i]t was clear that she was looking for some kind of consideration, and we made it clear" to her that her assistance "would not hurt her." *Id.* at 53. Second, Monroe's prosecutors testified on Smith's

sentence deal and Smith's informant history were suppressed by the prosecution.

## C.

With the first two requirements of a *Brady* violation satisfied, we turn to the third — and most difficult — of the *Brady* elements, that is, whether the suppression of exculpatory evidence was material to Monroe's first-degree murder conviction. Under *Brady*, "[t]he touchstone of materiality is a 'concern that the suppressed evidence might have affected the outcome of the trial.'" *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 559 (4th Cir. 1999) (quoting *Agurs*, 427 U.S. at 104). Put differently, suppressed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (internal quotations omitted). A reasonable probability, in turn, is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* at 434 (internal quotations omitted). An important consideration here is that, under *Kyles*, the question of materiality must be considered "collectively, not item by item." *Id.* at 436.

In assessing the issue of materiality, we must evaluate the importance of the Commonwealth's suppression of the Habeas Evidence. To do so, we first assess the Commonwealth's evidence that Monroe committed first-degree murder. We then weigh against this evidence the strength of Monroe's defense. Finally, we consider whether the Habeas Evidence, had it been disclosed and used effectively, is likely to have affected the verdict of first-degree murder. *United States v. Bagley*, 473 U.S. 667, 676 (1985). In other words, we examine whether the Commonwealth's suppression of the Habeas Evidence was material to the fairness of Monroe's trial.

---

behalf in a sentence reduction hearing in Chesterfield County Circuit Court on February 5, 1993, that Smith deserved a sentence reduction because "a portion of [Monroe's] sentence is due to Zelma Smith's testimony" and that "she's entitled to what we refer to as the cost of doing business." *Id.* at 54.

### 1.

It is clear that the Commonwealth's murder case against Monroe was somewhat thin and entirely circumstantial. Monroe's admissions during police questioning that she was present when Burde killed himself provided the strongest evidence against her. In addition, the Commonwealth presented evidence that it was unlikely that Burde had committed suicide. Third, the Commonwealth suggested that Monroe was jealous of Krystyna. Fourth, the Commonwealth emphasized that Monroe had a financial interest in Burde's death. Finally, and importantly, the Commonwealth introduced the testimony of Zelma Smith to support its allegations of premeditation and malice, both of which are essential elements of a first-degree murder prosecution in Virginia. We discuss these aspects of the prosecution's case in turn.

### a.

First, the prosecution introduced Monroe's admissions that she had been present when Burde committed suicide. On March 26, 1992, Agent Riley interviewed Monroe two times — first in the morning at Windsor, and again in the afternoon at the Virginia State Police headquarters. During the afternoon interview, Monroe recalled being present when Burde shot himself. At the start of this interview, Riley suggested to Monroe that she had been present when Burde committed suicide and that she must be blocking out that memory. Despite Riley's repeated and emphatic insistence that she must have been there, Monroe maintained, for about an hour, that she could not remember being present at Windsor when Burde died. It was only after Riley told Monroe that he had witnessed his own father's suicide that Monroe appeared to recall Burde's death.[24]

---

[24]According to Monroe's witnesses, she was highly suggestible in the weeks and months following Burde's death. She had developed a trusting relationship with Riley and deferred to his position of authority as a police investigator, believing that he had expertise in dealing with traumatic events. Finally, her father had committed suicide when she was a child, and she had been devastated by the event. These factors, according to Monroe, led her to accept Riley's suggestions; according to her, she had been virtually hypnotized by his repeated suggestions, and she simply adopted his version of the event.

Burde's youngest daughter, Corinna, also testified that Monroe had admitted, over lunch on April 1, 1992, that she (Monroe) had been present at Burde's suicide. Corinna's testimony was that Monroe had told her, "I was there when your father committed suicide." According to Corinna, she asked Monroe if she could have imagined this, and Monroe responded, "No, I was there." Monroe allegedly said that she had wanted to tell Corinna at Burde's funeral, but had not known what to say.

Similarly, Monroe signed a statement on June 3, 1992, admitting that she had been present when Burde committed suicide. Riley called Monroe on the morning of June 3, 1992, arranging to meet her at Drewery's Bluff, a Civil War park in the Richmond area. At this meeting, he presented Monroe with a list of incriminating evidence, and he informed her that the Commonwealth's Attorney planned to charge her with murder. In response, Monroe steadfastly maintained her innocence and began to backtrack on whether she had been present at Burde's suicide. She ultimately signed a statement, however, admitting to being present when Burde shot himself.[25]

b.

Second, the prosecution attempted to show that Burde did not commit suicide. Ann Jones, the Commonwealth's ballistics expert, testified that she found gunshot residue patterns on Burde's hands, on the couch on which his body was found, and around the wound itself. According to Jones, these patterns indicated that he had been shot between the third and fourth fingers on his right hand and that the gun had been close to (but not against) his head when it was fired. Further, she suggested that Burde's right hand had been covering his forehead when the weapon was discharged. Based on this information, Jones concluded that it was unlikely that Burde had killed himself. Dr. Mar-

---

[25]According to Monroe, Riley tricked her into signing the statement by telling her that the Commonwealth's Attorney might change his mind about prosecuting her for murder if she admitted she was present at Burde's suicide. Monroe testified that Riley had threatened to arrest her if she did not sign it, asserting that he had never lost a murder case, that he could twist her words so that no one would believe her, and that he could make her "out to be the biggest black widow spider of all time."

cella Fierro, the Medical Examiner, also testified for the Commonwealth. According to Dr. Fierro, the type of wound that killed Burde was uncommon in suicide wounds, in that the gun was not directly against his head when it was fired. According to these two witnesses, it was unlikely that Burde had committed suicide, although neither witness could rule out suicide as a possibility.[26]

The prosecution also produced evidence that Burde was upbeat and happy prior to his death and that he would not have committed suicide. According to Corinna, she never noticed that her father showed signs of depression. Further, several witnesses testified that Burde had seemed exuberant in the weeks before his death. For example, a real estate broker told the jury that Burde had been ecstatic about the possibility of acquiring a piece of property. Further, the prosecution brought out that Burde had scheduled plans for the days and weeks following his death. For example, the day before he died, he had asked Samuels, his secretary, about purchasing an exercise bike, and on the day of his death, he had made plans to have lunch with his publisher the next afternoon. On the basis of this evidence, the Commonwealth argued that Burde did not commit suicide.

c.

Third, the prosecution sought to show that Monroe was jealous that Krystyna was replacing her in Burde's life.[27] Burde's relationship

___

[26]Monroe produced her own expert witnesses who suggested that Burde had fired the gun himself, holding it with his right hand and pulling the trigger with his left thumb. According to Monroe, the residue tests, which were not disclosed to her defense before trial, confirm that Burde fired the gun himself. The district court held that Monroe had defaulted her right to rely on the residue tests. Because we do not need to reach the procedural default issues, we do not consider the residue tests in ruling on Monroe's *Brady* claim.

[27]In support of its theory that Monroe's relationship with Burde was having problems, the Commonwealth introduced a letter Monroe wrote to Burde in the fall of 1990, in which she expressed her frustration with him. According to the letter, Burde had placed innumerable conditions on her and on their relationship. Monroe wrote that Burde had never seriously proposed to her and that he did not understand the meaning of a marital commitment. She also dismissed the idea of a prenuptial agreement and concluded by saying that she was giving up on Burde.

with Krystyna began in 1989, when Burde and Monroe took a ski trip to Snowshoe Mountain in West Virginia. While waiting for the ski lift, Monroe overheard a couple speaking Polish. Knowing Burde was Polish and would be interested in meeting the couple, Monroe pointed them out. Burde introduced himself to Krystyna and her husband, Wojtek Drewnowska, and a friendship quickly developed between the two couples. After a few months, Burde and Krystyna became involved romantically. Monroe apparently knew of this relationship, and for the most part, she accepted it.[28] Krystyna was not Burde's first fling during his relationship with Monroe, nor was she the only other woman with whom he was involved immediately before his death.[29]

As his affair with Krystyna developed, Burde became obsessed with the idea of having another child. He was unhappy with his three children,[30] and he wanted a son to mold in his image. He sought assistance from a number of persons, including several of his girlfriends as well as other acquaintances, about finding a surrogate mother. In order to dissuade Burde from using an anonymous surrogate, one of Monroe's daughters, Katie, even offered (albeit with reservations) to donate an egg to allow her mother to carry Burde's baby. Despite these discussions about reproductive options, most of Burde's friends and family did not, at least initially, take the surrogacy discussions

---

[28]The prosecution produced some evidence that Monroe was jealous of Krystyna. Specifically, Krystyna testified that she had complained to the police in January of 1992 that Monroe was following her.

[29]In addition to his affair with Krystyna, Burde had an ongoing affair with Leonora Musselwhite, whom he had met while taking a computer class, and he had recently ended an affair with Pamela Moore. Evidence at trial indicated that he also had several short-lived affairs with women seen coming and going from Windsor. Furthermore, Burde had numerous affairs while he was married to Brigette. During his marriage, Burde maintained a long-term relationship with Myra Campbell, a secretary at Philip Morris, and he had another affair with a woman named Roache. Monroe testified that she understood and accepted Burde's need for sexual relationships with other women, and she described Krystyna as merely a "distraction."

[30]Prior to Krystyna's pregnancy, Burde had three daughters: Colette and Corinna from his marriage to Brigette, and Sylvia Meys from an affair in Europe during his marriage. By age, Sylvia was the middle child.

seriously, and they characterized the idea of Burde rearing another child as absurd. Young children irritated him, and he had a poor relationship with his existing children.

By 1991, however, it was clear that Burde was serious about having another child. When he could not find an anonymous surrogate, he discussed the idea with Krystyna, and she agreed to carry his baby. In 1990, Wojtek had confronted Krystyna about her affair, and they separated in the spring of that year. Initially, Wojtek and Krystyna merely lived in separate parts of their house, but Krystyna moved out in June of 1991. By February of 1991, Burde and Krystyna were actively trying to conceive a child, but Krystyna was having trouble becoming pregnant. As a result, she and Burde consulted a fertility expert in the Richmond area. This expert, Dr. Edelstein, conducted tests, found nothing physically wrong, and suggested that Burde and Krystyna should try to conceive more frequently. Burde asked Dr. Edelstein about the possibility of sex preselection, but Krystyna rejected the idea as unethical and immoral.

In planning for their new baby, Burde and Krysytna prepared several versions of a "baby agreement." In various drafts of this agreement, Burde agreed to provide support for a child that Krystyna would carry. The drafts also provided that Krystyna and Burde might hold themselves out as a married couple and might agree to live together. In early 1991, Monroe discovered an early draft of the baby agreement, and she testified that she then accepted the fact that Burde was serious about having a child. The baby agreement was never executed, but a later draft provided that Burde could not allow Monroe to accompany him in the presence of the child. Monroe had discovered the later draft three days before Burde died.[31] Through this draft

---

[31]Monroe acknowledged being upset when she discovered the draft baby agreement. She testified, however, that Burde had insisted that it was all Krystyna's idea, that he was being pressured by Krystyna to form a relationship he did not want, and that he wanted to remain with Monroe. Monroe insisted that Burde begged her not to leave him. Monroe said that she ultimately accepted the fact that Krystyna was having a baby, and she felt they had worked things out. Monroe's version of these events was confirmed by several witnesses, including witnesses called by the Commonwealth, who testified that Krystyna was not to be trusted and

agreement and Krystyna's testimony about her relationship with Burde, the Commonwealth contended that Krystyna was replacing Monroe in Burde's life.

d.

Fourth, the Commonwealth sought to show that Monroe had a financial interest in Burde's death. Burde was in the process of drafting a will that, if executed, might have reduced Monroe's share of his estate to a $20,000 annuity for six years, a Jaguar automobile, and some pieces of artwork from his collection.[32] Under his 1989 will, which was probated, Monroe stood to inherit between $500,000 and $900,000.[33] Monroe was also a joint beneficiary of Burde's life insurance policy, under which she stood to receive $50,000.

The Commonwealth also presented evidence that Burde had given Monroe $155,000 to purchase property on Kanawha Street in Henrico County (the "Kanawha property"). Monroe contributed $40,000 of her own money to purchase the Kanawha property, and she was the only

was a "gold digger in the truest sense of the word." Every witness who knew Burde preferred Monroe to Krystyna, and several witnesses testified that Burde's relationship with Monroe was as strong as ever at the time of his death. According to one of Burde's closest friends, Burde had hoped that Krystyna would surrender the baby to him once she gave birth, but he had come to realize that this would not occur.

[32]It is possible that Monroe actually would have received a larger share of Burde's estate under the draft will. The draft will contemplated that Burde might have a wife when he died, who stood to gain a large share of his estate. By some accounts, Burde was, at the time of his death, contemplating the possibility of marrying Monroe, and he had described himself as Monroe's fiancee as recently as January of 1992.

[33]According to Monroe, Burde was always in the process of revising his will. He was preoccupied with death, with his estate, and with controlling the lives of those around him. Thus, he continuously made notes about what should be done in the event of his death, how to dispose of his property, and how his survivors should conduct their affairs. In a letter accompanying his 1989 will, for example, he provided a long explanation of how he felt about his beneficiaries as well as about those whom he had disinherited.

owner listed on the recorded deed. The real estate lawyer who han-
dled the transaction testified that Burde contacted him in January of
1992, requesting that he "correct" the deed to list Burde as co-owner.
Monroe needed to consent for Burde to have an ownership interest in
the property, but as of the time of his death, she had not completed
the necessary paperwork.[34] The Commonwealth also produced evi-
dence that Burde intended the $155,000 to be a loan and that, in the
months before his death, he had wanted to formalize Monroe's obli-
gation to repay him. While his secretary, Barbara Samuels, had pre-
pared documents to this effect, Monroe never signed them. Through
evidence of the draft will, the life insurance policy, the deed correc-
tion, and the loan documents, the Commonwealth maintained that
Monroe had a financial motive to kill Burde.

e.

Finally, and importantly, Zelma Smith provided the Common-
wealth's primary evidence of premeditation.[35] Smith, an informant
with multiple felony convictions (for larceny, forgery, and check
fraud), testified that Monroe had contacted her about a year before
Burde's death in an effort to purchase an untraceable handgun.
According to Smith's testimony, she received a call in the spring of
1991 from someone identifying herself as "Ms. Nelson." When Smith
returned this call, she reached a man who advised her that there was

---

[34]Monroe suggested that Burde only wanted to be listed as an owner
because of a dispute with a neighbor. In order to litigate this dispute,
Burde needed an ownership interest in the Kanawha property. Ulti-
mately, Burde solved the ownership problem by convincing a local court
to allow him to assert the claim as Monroe's fiancee.

[35]Although Smith's testimony was the primary evidence of premedita-
tion, the prosecution also argued that Monroe had discovered the baby
agreement a few days before Burde's death and that she might have
known about the draft will. While the baby agreement and the draft will
provide some evidence of motive, they fail to show premeditation. The
only evidence arguably supporting premeditation, other than Smith's tes-
timony, was Corinna's testimony that she received phone calls from
Monroe in the months before Burde's death in which Monroe expressed
concern about Burde's mental state. According to the prosecution, these
calls demonstrated that Monroe had planted the idea of Burde's depres-
sion.

no Ms. Nelson at that number. Smith claimed that she then heard a brief conversation in the background, after which a woman came on the line. The woman said that she was Ms. Nelson, that it was a bad time to talk, and that she would call Smith back. When Ms. Nelson called back, she asked Smith to meet with her at a Burger King in Richmond.

At the Burger King meeting, the woman offered Smith $800 to obtain a small handgun, indicating that she was aware of Smith's prior criminal history. According to Smith, she received $100 for her expenses. After she obtained a .357 caliber handgun, Smith arranged a follow-up meeting at a local cemetery. At this meeting, however, Ms. Nelson rejected the firearm as too large, although she provided Smith with an additional $480 for her expenses. Smith never heard from Ms. Nelson again. At trial, Smith identified Beverly Monroe as Ms. Nelson. Smith testified that she had read about Monroe's case in a news publication, perhaps *People* magazine, and that she contacted the Commonwealth's Attorney when she made the connection between Monroe and Ms. Nelson. On the basis of Smith's testimony, the Commonwealth contended that Monroe had killed Burde with premeditation and malice aforethought, elevating the offense to murder in the first degree.[36]

2.

In her defense, Monroe presented two alternate explanations for Burde's death, both of which supported acquittal. First, she sought to prove that Burde had committed suicide. Second, she suggested that Burde could have been murdered by someone else. In addition to these alternate explanations for Burde's death, Monroe presented an alibi, showing that she had been at a grocery store miles from Windsor around the time of Burde's death. Finally, she highlighted the flaws in the police investigation. We briefly review these aspects of her defense.

---

[36]Seeking to bolster Smith's credibility, the prosecution improperly vouched for her veracity in closing argument, representing that "the absolute truth is that she did not ask for any consideration for her testimony from the Commonwealth in this case. And it's absolutely true that the Commonwealth has not promised her anything."

a.

First, Monroe presented evidence supporting her contention that Burde had committed suicide. Numerous witnesses testified to Burde's precarious mental state, portraying him as mentally unstable, overbearing and controlling, cruel and abusive to those around him, and prone to obsessive and paranoid behavior. Monroe also presented evidence indicating that Burde had reason to be suicidal. His desire to produce a male heir was not going as planned; he was strapped for cash; he was concerned about his health; he was preoccupied with death; and he was in danger of being exposed as a fraud. Finally, numerous witnesses, including Commonwealth witnesses, confirmed that Burde was depressed in the weeks and months preceding his death.

By all accounts, Burde displayed classic signs of manic depression and narcissism. According to several witnesses, he was constantly embarking on ambitious projects, and he experienced extreme and erratic mood swings, going through periods of elation followed by periods of lethargy and despair. As for the indications of narcissism, numerous witnesses testified that Burde had an inflated sense of self-importance. He was consumed by social status, looking down on others and refusing to associate with those who were not part of the "social elite." He also had unreasonable expectations that others should conform to his expectations,[37] and he tended to exploit those around him for his own ends. He thought that the women in his life should be treated as his property,[38] and he offered certain of his relatives and

---

[37]For example, Burde conditioned gifts to Ditta and Sig Huber, his niece and nephew, on the following criteria: "They must maintain supportive contact with Colette, Corinna de la Burde and Sylvia Meys. In this spirit, they must see the other members of the family as [sic] least once every five years and must keep in touch by telephone every three months."

[38]By way of example, his search for a surrogate mother was based on the idea that people could be bought and sold. Along these lines, the draft baby agreement conditioned Burde's obligation to pay child support on Krystyna remaining close to Richmond. If she moved more than fifty miles from the Virginia capitol, she would lose half of the child support payments, and if she moved out of Virginia, she would lose them all together.

friends monetary incentives to adopt the "de la Burde" name.[39]

Burde was also portrayed as irritable and overbearing. He was constantly critical of his daughters, calling them insulting names and berating them for the company they kept, the clothes they wore, and the amount of makeup they used. He described them as "losers" and unworthy of the de la Burde name. In a letter to his youngest daughter Corinna, he wrote, "you have carried with you all garbage of low class associations" and "you have to empty your home from the baggage of the past in which you can take neither pride nor happiness."[40] He warned Corinna that she would "imprison [her] children in the mediocrity for the generations to come" because of her associations with people who were "not from the same class." In a letter accompanying his 1989 will, he admonished Colette, his oldest daughter, to "[u]se your energy toward higher goals instead of low class pursuits . . . [d]ress up, loose [sic] weight, look up and better yourself."[41] Similarly, in the will itself, he implored Colette to associate "with people of her own upbringing and class."

In order to establish that Burde was the type to contemplate suicide, Monroe introduced evidence that he felt himself to be above common strictures of law and morality. For example, he held unconventional views of personal relationships and sex. He propositioned many of the people who worked for him, men and woman alike. For instance, he made advances toward Charles Moore, a friend who did construction work at Windsor, and he asked Sheldon Gosline — a graduate student who had lived at Windsor while cataloguing Burde's art collection — to participate in a menage a trois. His close friends also testified about sex parties hosted by Burde. Burde even sought to persuade Monroe and Frank Vegas, one of Burde's closest friends,

---

[39]Burde, for instance, conditioned gifts to Ditta and Sig Huber on the requirement that "They must have obtained legal use and must have used the name 'de la Burde' in all of their daily conduct for not less than five years prior to the death of Roger de la Burde."

[40]The letter was titled "In a Dust of Crumbled Prayers and Dreams Lies Your Future and Your Happiness, Corinna."

[41]In this same letter, he criticized Brigette, claiming that her "passive and negative attitude was unbearable. There was no competence, no caring and no desire to help or share. Ever!!"

to marry wealthy individuals in order to inherit their money. For example, Vegas testified that Burde introduced him to an older woman and suggested, in apparent sincerity, that Vegas should marry her and then hasten her death by hiding her heart medication.

Along similar lines, Burde was involved in unorthodox and illicit business affairs.[42] Most significantly, his prized collection of African sculptures was filled with fakes.[43] Vegas testified that he had sculpted many of the pieces in Burde's collection and that Burde passed these works off as the works of famous sculptors. At one point, Burde asked Vegas to take up residence in the cottage at Windsor and receive a salary to churn out phony sculptures that could be sold in Europe. Pamela Moore, one of Burde's ex-girlfriends, testified that she saw Burde "aging" some of his sculptures on his roof so that he could pass them off as older works. Similarly, Charles Moore testified that Burde had him prepare duplicate canvasses of famous paintings. Along these lines, Sig Huber (Burde's nephew) and Krystyna were caught in New York trying to trade a sculpture under false pretenses.[44]

[42]Even in his legitimate business deals, Burde was bombastic and litigious. Most notably, he was involved in a *Bleak House*-type suit against Philip Morris. After the company forced Burde into retirement, he brought suit, claiming that it had refused to pay him royalties on a patent. In response, the company filed a $50 million counterclaim. The suit dragged on for years, and Burde was frustrated that Philip Morris would not settle. In time, Burde purchased a handgun, fearing that the company would send someone after him. He also became embroiled in the dispute with the neighbors of the Kanawha property. Although Monroe wanted to settle amicably, Burde insisted on dragging the neighbors to court.

[43]Burde's real estate transactions were similarly suspect. He ordered brokers to make an unusual number of offers on property, and he consistently overextended his cash position. He also evaded the federal tax laws, claiming deductions for rent he paid on Krystyna's apartment by reporting it as a business expense, and telling others to report artificially low values on gifts in order to deceive the IRS.

[44]In his draft will, Burde provided evidence of the art forgeries in his peculiar instructions for the disposition of his art collection: "[t]hat collection should not be sold unless in dire emergency . . . . In the case of emergency you should never permit any dealer to show the collection to his clients because it will destroy the value. You should never forward photos to the dealers."

Finally, Monroe presented evidence that Burde's behavior began to change in January of 1992. For example, he developed a sudden interest in religion, taking up Catholicism in the months before his death (which occurred on Ash Wednesday). He started corresponding with a Polish nun, who chastised him for his sins and admonished him to repent. It came out at trial that Burde was a "follower" of the Nigerian god E'shu, who — legend had it — had committed suicide. Burde had also become concerned about growing older. He talked about death and his fear of dying alone. He was experiencing health problems, including chest pain, prostate problems, blood in his urine, and impotence.[45] He was also worried about gaining weight and losing his hair. He was caught between Krystyna and Monroe, and his dream of a male heir was seemingly never going to materialize. Finally, he was in danger of being exposed as a fraud.[46] In general, several witnesses suggested that Burde had lost his zeal for life.[47] He had spoken of suicide in the past, going so far as to say "I'll kill myself," and his mother had attempted to kill herself.[48] On this basis, Monroe argued that Burde had committed suicide.

---

[45]In the months before his death, Burde began to take medications to treat hypertension, including Kerlone, Maxzide, and Hytrin. On appeal, Monroe brought out that the adverse effects of Kerlone are, among others, depression, emotional instability, decreased libido, disorientation, and impotence. The other medications had side effects that include lethargy, drowsiness, fatigue, and depression.

[46]In support of the proposition that exposure was imminent, some witnesses testified, without providing any detail, that Burde was being blackmailed.

[47]For example, Sylvia Beckner, a family friend, testified that Burde became depressed around January of 1992, marked by his forgetfulness and sloppy appearance. During this period, Burde would come to Beckner's flower shop wearing a dress suit and bedroom slippers. Burde talked to her about his fear of dying alone; he was depressed about growing old, being alone, and his poor relationships with his children.

[48]Don Belville, the last known person to speak to Burde, said that Burde had been acting strangely in the weeks before his death, wanting to get things finished in a peculiar hurry. Belville said that Burde sounded so strange during this phone call that Belville had taken notes of the conversation. According to Belville, Burde claimed that he "was going to make some changes in his life," and he felt like the "world was off his shoulders."

b.

As an independent basis for acquittal, Monroe attempted to show that Burde had many enemies, any one of whom could have killed him. In particular, Monroe cast suspicion on Krystyna Drewnowska, characterizing her as a jealous, temperamental mistress. Monroe also suggested that Burde's family had personal and financial motives to kill him. Corinna, for example, admitted that Burde was a controlling father and that he ridiculed those closest to him. Finally, Monroe identified a litany of other suspects, including Burde's ex-girlfriends, their husbands, Philip Morris, and those involved in Burde's illicit business affairs.

First, Monroe presented evidence suggesting Krystyna may have murdered Burde. On March 4, 1992, the day Burde died, Krystyna had received a report confirming that her baby was a girl. In the days following Burde's death, Krystyna cancelled the abortion she had scheduled for March 11, 1992, hired an estate attorney, got a blood sample from Burde to "verify the heirship" of her daughter, gave police a letter that Monroe had written to Burde in 1990, and left the country until Monroe was indicted. Monroe also presented evidence that Krystyna was extremely jealous and that she resented Monroe's continued presence in Burde's life.[49] Toward this end, she apparently wanted Burde to agree that Monroe could not accompany him in the presence of their child. Burde's draft will made no provision for Krystyna or her child, but because of his death, the unborn child stood to inherit under Virginia's pretermitted child statute.[50]

Second, Monroe suggested that Corinna was a logical suspect. Corinna had access to her father's house; she knew where Burde kept

---

[49]For example, several witnesses testified that Burde had attended a cultural event with Monroe and her family on the Saturday before his death. At this event, Burde had been photographed by a local newspaper while dancing with another woman. He was terrified that Krystyna would see this picture in the paper.

[50]Under Virginia law, a parent may disinherit a child by refusing to provide for the child by will, but if a child is born after the parent's last validly executed will, such a "pretermitted" child is entitled to share in the parent's estate. Va. Code Ann. § 64.1-70.

the handgun that killed him; and she smoked the type of cigarettes found in the library near his body.[51] Corinna also had a motive to kill her father. She did not get along well with him, describing him as a hard man to please and reportedly fighting with him at family gatherings. According to witnesses, he hated her apartment, her job, her friends, and her appearance, and she resented Burde's attempts to control her life. Corinna knew that her father might disinherit her at any time, and she was unhappy about Krystyna's pregnancy, knowing that Burde was actively seeking a male heir to replace her as the primary beneficiary of her father's estate.[52]

Finally, Monroe identified a litany of other potential suspects, including:

- Wojtek Drewnowska — He was married to Krystyna and jealous of her relationship with Burde. After finding one of Burde's love letters to Krystyna, he angrily confronted Burde and told him to stay away from her. He had threatened to expose Burde's fraudulent art activities.

- Pamela Moore — She had an affair with Burde, which had ended badly in 1991 and led to a separation from her husband. She had access to Windsor; she knew where Burde kept his handgun and how to use it; she had a violent temper; and she smoked the brand of cigarettes found at the scene.

- Charles Moore — Pamela's husband owed Burde money, and Burde had been pressuring him for it in the days before his death. Burde had broken up his marriage

---

[51]Deputy Neal observed two Marlboro Light cigarette butts in an ashtray near where Burde's body was found. Burde did not smoke this brand.

[52]Burde had already disinherited his oldest daughter Colette. Colette had moved to New Orleans many years before Burde's death, and she rarely saw him. Further, Corinna stood to gain from Monroe's conviction, since Monroe's share of the estate would then be distributed to the other beneficiaries. Compared to Corinna, the other beneficiaries of Burde's 1989 will took a relatively small share of Burde's estate.

and made sexual advances toward Charles himself.
Moore had also copied canvasses for the art forgeries,
giving him a motive to keep from being implicated in the
fraud.

- Sheldon Gosline — He might have participated in
  Burde's fraudulent art activity. He had helped Burde
  catalogue the collection, and he admitted that Burde had
  given false statistics for some of the sculptures. There
  was an implication that Gosline's academic reputation
  might be tarnished by exposure of the fraud, which gave
  him an incentive to keep the truth from surfacing.

- Philip Morris — Burde had stolen sensitive documents
  from Philip Morris, and he had threatened to expose the
  company for concealing scientific evidence that smoking
  was addictive. Burde was fearful that the company
  would seek to harm him.

Monroe's defense team maintained that, because of these other sus-
pects, the prosecution's case against her was riddled with reasonable
doubt.

c.

Monroe also produced evidence of an alibi. The Commonwealth's
forensic expert testified that Burde died around 10:30 p.m., on March
4, 1992, a time when Monroe could show that she was miles away
from Windsor. Her son, Gavin, testified that she had arrived home at
about 10:00 p.m. on the night of Burde's death. According to Gavin,
Monroe asked him if he needed anything from the grocery store. She
then departed for the store at about 10:20 p.m., returned home by
10:45 p.m., and remained home for the rest of the evening. Gavin's
testimony was confirmed by a grocery store receipt and a cancelled
check, establishing that Monroe was in the Safeway store near her
home (about thirteen miles from Windsor) at 10:40 p.m. on March 4,
1992. Further, Monroe produced a neutral witness who testified to
having met her in the Safeway store that evening. The witness was
sure he recognized Monroe, recalling that he had talked to her about
his contracting business and that he had given her his business card.

In light of this alibi evidence, it seemed unlikely that Monroe killed Burde.[53]

d.

Finally, Monroe emphasized the poor investigative work of the police. For example, Deputy Neal failed to secure Windsor as a crime scene on the morning of March 5, 1992. He also failed to follow several standard investigative procedures, including:

- collecting the cigarette butts found near Burde's body or investigating remnants of materials which had recently been burned in the fireplace;

- searching for a suicide note or securing other papers in Burde's office, including legal documents, wills, letters, or notes;

- preserving the clothes Burde was wearing or keeping the sofa on which he died;

- testing a feather/hair fragment that was resting on Burde's body when he was found; and

- dusting for fingerprints.

Even Agent Riley acknowledged that Deputy Neal had conducted a poor investigation, and Monroe suggested that critical forensic evidence — such as hair, fibers, blood, and gunshot residue — had been lost as a result.

---

[53]The prosecutors had two explanations for Monroe's alibi. First, they suggested that she was not in the grocery store that evening. Instead, someone else with her check cashing card could have been there, and the neutral witness could have been confused about when he had met Monroe. Alternatively, the Commonwealth suggested that the time of death was merely an estimate, and that Monroe could have killed Burde just prior to or immediately following her trip to the Safeway store.

Monroe also sought to show that Riley had manipulated the investigation of Burde's death. According to Monroe, Riley had prejudged the investigation, deciding at its outset that she had killed Burde and then setting out with the single goal of proving his theory. In order to provide evidence that the investigation was biased, Monroe showed that Riley pressured Commonwealth experts into accepting his version of Burde's death. For example, Riley sought to influence the opinions of the Commonwealth's ballistics and forensic experts. As evidence of this, Monroe brought out that the Medical Examiner's office delayed issuing a report on Burde's death and that it altered its initial opinion on the cause of death (ultimately labeling the death a homicide) because of pressure from Riley. In another example of a biased investigation, Monroe sought to establish that Riley ignored many leads, failing to interview suspects such as Krystyna until after Monroe was indicted.

### 3.

The Commonwealth's first-degree murder case against Monroe can fairly be characterized as tenuous: its evidence was entirely circumstantial, and Monroe presented a strong defense. The Habeas Evidence, had it had been available at Monroe's trial, would have further undermined an already marginal first-degree murder prosecution. With the trial evidence viewed in this light, we must decide whether, had the Habeas Evidence been properly disclosed, there is a reasonable probability that the verdict of first-degree murder would have been different.

The ten items of Habeas Evidence (five of which are impeachment material on Zelma Smith) consisted of the following:

> (1)   the Smith gun deal — the Commonwealth's promise not to prosecute Zelma Smith, a convicted felon, for her possession of a firearm;

> (2)   the Smith sentence deal — the Commonwealth's promise to assist Smith in obtaining a sentence reduction on an unrelated charge in Chesterfield County;

(3) Smith's informant history — Smith's history of offering information to the authorities before she testified at Monroe's trial;[54]

(4) Smith's inconsistent statements — Smith's statements, documented in Riley's notes, that were inconsistent with Smith's trial testimony;

(5) the Lundy information — Smith's statement to Riley that Eric Lundy provided her with the firearm she offered to Monroe, an allegation that Lundy denied;

(6) Samuels's personal problems statement — Samuels's statement to Deputy Neal that Burde had been having personal problems prior to his death;

(7) Samuels's napping habits statement — Samuels's statement to Deputy Neal that Burde usually napped in a position different from the one in which he was found, that is, on a different couch, on his back, and with his hands behind his head;

(8) Corrina's male heir statement — Corinna's statement that Krystyna did not want to know the sex of her baby because she knew that Burde did not want a girl;

(9) the secretaries' notes — the notes taken by two secretaries, which corroborate Monroe's account of a March 26, 1992, interview; and

(10) the Bronco witnesses — the identity of two witnesses who told the Powhatan County Sheriff's Office that

---

[54]In particular, Smith had worked with Riley on political corruption cases that he was investigating in coordination with the FBI. She had also offered information on an unrelated murder investigation in Chesterfield County. Habeas Opinion at 54.

they saw a vehicle speeding away from Windsor at about the time of Burde's death.[55]

The Commonwealth insists that its suppression of the Habeas Evidence was, in the final analysis, immaterial to Monroe's conviction, because no single item thereof would have been significant to Monroe's defense. Contrary to this assertion, we must examine the Habeas Evidence collectively, not item by item. *Kyles*, 514 U.S. at 436. Considered in this manner, this suppressed, exculpatory material would have undermined essential aspects of the Commonwealth's case, particularly its proof of premeditation and malice.

Importantly, the Commonwealth asked the trial jury to convict Monroe of first-degree murder. In Virginia, such a crime has three essential elements: "(1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Rhodes v. Commonwealth*, 384 S.E.2d 95, 98 (Va. 1989). The specific intent element of first-degree murder requires proof of willfulness, deliberation, or premeditation. Va. Code Ann. § 18.2-32. Absent proof of the requisite specific intent, a homicide may be second-degree murder, which is any killing with malice, or it may be voluntary manslaughter, if it was committed in the heat of passion. *Willis v. Commonwealth*, 556 S.E.2d 60, 63-64 (Va. Ct. App. 2001). A homicide that is unintentional and without malice may be, at most, involuntary manslaughter. *See Craig v. Commonwealth*, 538 S.E.2d 355, 359 (Va. Ct. App. 2000). In other words, absent proof of premeditation and malice, Monroe could not have been convicted of first-degree murder.

Faced with a dearth of evidence on premeditation and malice, the

---

[55]Before trial, the Commonwealth advised Monroe's defense that it had received an "anonymous" tip that a "dark colored Bronco/Blazer type vehicle was seen leaving" Windsor around the time of Burde's death. However, the Bronco witnesses, a Mr. and Mrs. Johnson, Burde's next door neighbors, had provided their names to the Powhatan County Sheriff's Office. In the summer of 1994, Monroe learned from Mr. Johnson that the Bronco tip was not anonymous and that he and Mrs. Johnson had provided some detail about the vehicle and its driver, most notably that it was speeding away from Windsor and that the driver was a white male.

Commonwealth's Attorney needed to convince the jury to credit the testimony of Zelma Smith. Smith was the only witness to offer evidence that Monroe had planned her crime in advance of the event. Accordingly, the prosecutor stressed in closing argument that "Zelma Smith got on that stand and was . . . direct and straightforward, and looked you right in the eye and told you exactly what had transpired." The five items of Habeas Evidence relating to Smith, however, undermine these representations. On Smith's testimony alone, the prosecution had suppressed: (1) the Smith gun deal; (2) the Smith sentence deal; (3) Smith's informant history; (4) Smith's inconsistent statements; and (5) the Lundy information (collectively, the "Smith Habeas Evidence"). Without the Smith Habeas Evidence, Monroe was unable to effectively counter the Commonwealth's portrayal of Smith as a trustworthy witness. If the prosecution had complied with its disclosure obligations, however, Smith's testimony would have been significantly undermined, and there is a reasonable probability that the first-degree murder prosecution of Monroe would have collapsed.

With respect to the two Smith deals — the Smith gun deal and the Smith sentence deal — the Commonwealth now contends (seeking to minimize the importance of the Smith Habeas Evidence) that it was obvious to the jury that Smith expected consideration from the prosecution in exchange for her trial testimony.[56] At trial, however, the prosecutors insisted during closing argument (astoundingly, in light of what is now known) that Smith had no incentive to lie, telling the jury that:

> [a]s hard as it might be for you to believe, the absolute truth is that she did not ask for any consideration for her testimony from the Commonwealth in this case. And it's absolutely true that the Commonwealth has not promised her anything.

Contrary to the prosecution's representation to the jury, the Commonwealth *had* (as the district court found) provided substantial consider-

---

[56]The Commonwealth's current position is that "[i]t is extremely doubtful whether the jurors believed her subjective claim not to have had any thought of benefiting from her . . . testimony." Appellant's Br. at 38.

ation to Smith in exchange for her testimony against Monroe. Habeas Opinion at 53-54. And the two deals between the Commonwealth and Smith in exchange for her testimony seriously undermine Smith's credibility.

Indeed, in the words of the Supreme Court, the prosecution's failure to disclose those agreements "is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972); *see United States v. Meinster*, 619 F.2d 1041, 1044-45 (4th Cir. 1980) ("When the terms of a 'deal' between the government and a witness create a motive for falsification, the jury's perception of the witnesses' testimony is likely to be affected."); *United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976) ("[T]he prosecution allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness."); *Boone v. Paderick*, 541 F.2d 447, 448 (4th Cir. 1976) ("Had the jury known of the prosecution witness' compelling motivation to establish . . . guilt, there is a reasonable likelihood its verdict might have been different."); *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

In addition to the two Smith deals, the prosecution suppressed other significant impeaching material on Smith, particularly Smith's informant history and the Lundy information. First, as the district court found, Riley was aware of the fact that Smith had a history of providing information to the authorities before she testified against Monroe. Specifically, Smith had offered to provide evidence in an unrelated murder investigation in Chesterfield County, and she had assisted Riley on political corruption investigations that he was working on with the FBI.[57] According to Riley's notes, he knew that Smith

---

[57]The timing of Smith's assistance in these other matters is the subject of dispute, but the district court found that the prosecution had constructive knowledge of her informant history. Habeas Opinion at 54. This finding is not clearly erroneous. In fact, it is clear from Riley's deposition that Riley knew that Smith had been in contact with the FBI in August of 1992, and Riley's notes make clear that he knew of her assistance in other matters. *Id.*

had provided information to the authorities in previous cases, writing that Smith "gave info re: a murder case," that she had a "history of trying to deal info," and that she was a "professional snitch." Notwithstanding the information contained in Riley's notes, Smith's informant history was concealed from Monroe's defense.

Second, the Commonwealth failed to disclose Lundy's identity to the defense. By Riley's own admission, he assumed that Lundy would have contradicted Smith's trial testimony. Indeed, once the defense learned of Lundy's identity, Lundy swore that he had never provided Smith a firearm, in 1991 or otherwise. A live witness, directly contradicting Smith's testimony about her connection to Monroe, would have given the jury strong reason to doubt Smith's veracity. Significantly, the jury, had it had been shown that a major prosecution witness was testifying falsely, is likely to have been more sympathetic to Monroe's entire defense.[58] We can never know whether the jury would ultimately have decided to reject Smith's testimony. This possibility, however, cannot be disregarded, and it throws into serious doubt the reliability of Monroe's first-degree murder conviction.

Assessing the Smith Habeas Evidence collectively, as we must do under *Kyles*, we conclude that there is a reasonable probability that, had the Commonwealth made the proper disclosures, the jury would not have found that Monroe killed Burde with premeditation and malice aforethought. Taken as a whole, the Smith Habeas Evidence — Smith's gun and sentence deals, her history as an informant, her inconsistent statements, and Lundy's testimony — would have rendered Smith's testimony far less credible.[59] In fact, the Commonwealth virtually concedes as much on appeal, asserting that Smith's testimony was unnecessary to Monroe's conviction. To the contrary, Smith's testimony was the Commonwealth's major evidence of premeditation, and it effectively portrayed Monroe as a calculating killer. Thus, contrary to the Commonwealth's current position, Smith's trial testimony was not only relevant to Monroe's conviction, it was cru-

---

[58]The inconsistencies between Smith's statements to police and her testimony would have provided Monroe a further basis for impeaching Smith's testimony.

[59]Indeed, after trial, Zelma Smith apparently admitted to a jailmate in a Goochland correctional facility that she had lied at Monroe's trial.

cial. In sum, had the Smith Habeas Evidence been properly disclosed, there is a reasonable probability that Monroe would not have been convicted of first-degree murder.[60]

4.

We have recently observed — and we reiterate here — that "*Brady* does *not* create a full-scale, constitutionally-mandated discovery right for criminal defendants." *Spicer*, 194 F.3d at 555. As Judge Niemeyer aptly put it, "[s]uch a rule would impose an oppressively heavy burden on prosecutors and would drastically undermine the finality of judgments." *Id.* At the same time, as Justice Sutherland emphasized long ago, a prosecutor is:

> the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Berger v. United States*, 295 U.S. 78, 88 (1935). The duty to disclose exculpatory material in a timely manner "illustrate[s] the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler*, 527 U.S. at 281.

In most situations, a prosecution's failure to disclose exculpatory evidence turns out to be inadvertent,[61] and we do not presume that

---

[60]The other five items of Habeas Evidence would have further undermined the Commonwealth's case. The secretaries' notes would have been helpful in countering the prosecution's evidence on Monroe's statements in the March 26, 1992, interview. The Bronco witnesses would have told the jury that a Bronco-like vehicle, driven by a white male, was seen speeding away from Windsor the night of Burde's death. In addition, the statements made to Deputy Neal — Samuels's personal problems statement, Samuels's napping habits statement, and Corinna's male heir statement — would have impeached important prosecution witnesses.

[61]On this record, it is difficult to ascertain whether the suppression of the Habeas Evidence resulted from bad faith, sharp practice, negligence, or inadvertence. While we are necessarily troubled by the prosecution's failure to satisfy its disclosure obligations, we need not decide whether that failure was attributable to bad faith. *Brady*, 373 U.S. at 87.

such a failure has necessarily affected the outcome of a trial. Indeed, the materiality requirement announced in *Brady* provides an important limitation on the remedy available to a defendant when the prosecution has failed to comply with its disclosure obligations. It ensures that *Brady* obligations do not become unduly burdensome, while recognizing the awesome power of the prosecutor in our criminal justice system. Nevertheless, in assessing materiality, a reviewing court need not be convinced to an absolutely certainty that proper disclosures, had they been made, would have resulted in a different verdict. Indeed, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

Applying these well established *Brady* principles, courts have awarded relief in situations similar to the Commonwealth's suppression of the Habeas Evidence. *See, e.g.*, *Giglio*, 405 U.S. at 154-55 (awarding new trial because of suppression of impeaching evidence on one witness); *Spicer*, 194 F.3d at 560-61 (same); *Crivens v. Roth*, 172 F.3d 991, 998-99 (7th Cir. 1999) (same); *United States v. Service Deli Inc.*, 151 F.3d 938, 944 (9th Cir. 1998) (same); *see also Killian*, 282 F.3d at 1209-10 (awarding new trial based primarily on suppression of impeaching evidence on one witness). Like the *Brady* material addressed by these courts, the Habeas Evidence would have significantly impaired the credibility of Zelma Smith, a key prosecution witness, and, in turn, it would have undermined the prosecution's proof of premeditation and malice. In these circumstances, it is impossible to say that Beverly Monroe received a fair trial, or that we should be confident she is guilty of first-degree murder.

## IV.

Pursuant to the foregoing, we affirm the district court's award of habeas relief in appeal No. 02-6548. We dismiss Monroe's cross-appeal, No. 02-6625, declining to issue a certificate of appealability on the sufficiency of evidence claim, and finding it unnecessary to reach the certificate of appealability issue with regard to procedural default.

*AFFIRMED IN PART AND DISMISSED IN PART*