**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-20**

WARREN ROBERT GREGORY,

Petitioner - Appellant,

versus

MARVIN L. POLK, Warden, Central Prison,
Raleigh, North Carolina,

Respondent - Appellee.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  Terrence W. Boyle,
District Judge.  (CA-01-84-5-BO-HC)

Argued: May 22, 2006                    Decided: July 7, 2006

Before NIEMEYER, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** William Gregory Duke, BLOUNT & DUKE, Greenville, North
Carolina, for Appellant.  Edwin William Welch, Special Deputy
Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh,
North Carolina, for Appellee.  **ON BRIEF:** Steven M. Fisher,
Greenville, North Carolina, for Appellant.  Roy Cooper, North
Carolina Attorney General, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

We granted a certificate of appealability in this state court capital murder case under 28 U.S.C. § 2253(c) to review whether the district court was correct in concluding that the state court's decision to deny the defendant's Brady claim was neither contrary to federal law nor an unreasonable application of federal law. See 28 U.S.C. § 2254(d).

Petitioner Warren Robert Gregory was convicted on April 13, 1993, in state court in Pitt County, North Carolina, of multiple counts of kidnaping, rape, and murder. For each of his two murder convictions, Gregory was sentenced to death. The North Carolina Supreme Court affirmed the convictions and sentences, State v. Gregory, 459 S.E.2d 638 (N.C. 1995), and the United States Supreme Court denied Gregory's petition for a writ of certiorari.

On March 17, 1997, Gregory filed a post-conviction Motion for Appropriate Relief (MAR) in state court, which the court denied. On appeal, the North Carolina Supreme Court remanded the case in light of its decisions in State v. McHone, 499 S.E.2d 761 (N.C. 1998), and State v. Bates, 497 S.E.2d 276 (N.C. 1998). Gregory then received some discovery from the State and, based on the documents produced, claimed that the State improperly withheld exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83 (1963). The state court rejected Gregory's contention, and the North Carolina Supreme Court declined to review that decision.

-2-

Gregory then filed a petition in the district court under 28 U.S.C. § 2254 for a writ of habeas corpus, raising numerous issues. The district court dismissed his petition and also denied his application for a certificate of appealability. We granted a certificate of appealability only with respect to the issue of whether the State violated Brady in withholding exculpatory evidence prior to trial. After careful review, we now affirm.

I

Gregory, Kendrick Bradford, and Richard Gonzales were Marines stationed at Camp LeJeune in Jacksonville, North Carolina, who, in the early morning of August 24, 1991, were driving to a club in Greenville, North Carolina. Gregory was driving a Nissan Sentra that he had borrowed from the mother of one of his children, and all three Marines were drinking E&J Brandy and Coca-Cola. When they came upon Wesley Parrish, Bernadine Parrish, and Bobbie Jean Hartwig, who were walking along the highway on their way to visit a friend in Ayden, North Carolina, Gregory stopped the car to offer them a ride. Because it appeared to Wesley Parrish that all six adults could not fit in the small car, he turned down the offer of a ride, and the Marines drove away. They turned around, however, returned to the pedestrians, and again offered them a ride. Gregory then raised a shotgun and ordered the three pedestrians to hand over their money and wallets. After they complied, Gregory

ordered the two women to enter the car and Wesley Parrish to walk away. As Wesley Parrish was obeying, Gregory fired three shots at him and drove away. Although Parrish was seriously injured, he survived. He was later rescued by a passing driver and taken to the hospital.

In the meantime, Gregory drove the car into a field near Pitt Community College, where the car became stuck in a ditch. Gregory ordered the women into a wooded area, where all three men raped them.

Gregory then tried to strangle Bernadine Parrish, but when she regained consciousness, he snapped her neck. He stated that he killed Parrish to avoid going to prison. He then strangled Hartwig and left her in a ditch with Parrish. While the Marines were working to extricate the car from the ditch in which it had become stuck, using the women's clothing for traction, Hartwig revived and began screaming. Gregory asked Bradford to "take care of business." When Bradford picked up a pistol, Gregory told him not to use it because "if you use the pistol you are going to have to shoot her three or four times." Bradford then shot Hartwig in the chest with the shotgun, killing her.

The men eventually freed the car from the ditch and returned to Camp LeJeune, stopping at an automatic car wash along the way to wash the car.

-4-

The women's bodies were not discovered until September 10, 1991, over two weeks later, at which point their bodies were badly decomposed. A key ring discovered at the scene was identified as the key to Bradford's barracks room. (The duty log at Camp LeJeune indicated that Bradford had to be let into his room at 8:06 a.m. on August 24, 1991.) Also found at the scene was a large bottle of E&J Brandy that had been sold at Camp LeJeune. An investigation of the Nissan Sentra revealed blood inside, although there was an insufficient quantity to permit DNA testing, and hair fibers in the back seat that were consistent with Hartwig's hair. The car also had damage to its undercarriage.

On September 7, 1991, during the investigation of an unrelated crime, police found a Raven .25 automatic pistol in the master bedroom of a house in which both Bradford and Gregory were sleeping. They also found a 12-gauge pump-action model 500 Mossberg shotgun in a van parked at the residence. The shotgun used shells of the type found at the crime scene.

Police later learned that Gregory had had these guns in his barracks room the day before, on September 6, 1991. At that time, Gregory gave Maurice Glover and Bradford the weapons, which the two used to commit armed robbery later that evening. At trial, Glover testified against Gregory, stating that on September 6, 1991, Gregory told him about killing the two women, including the fact that Richard Gonzales was reluctant to participate.

-5-

Gonzales turned himself in on September 12, 1991, and pleaded guilty to second-degree murder, rape, and kidnaping. He testified in detail at Gregory's trial about the murders and what occurred in the early morning hours of August 24, 1991.

Malik Shabazz testified at Gregory's trial, stating that in 1992, while he and Gregory were both in prison, Gregory talked about the crime in great detail.

Finally, before trial, Kendrick Bradford confessed to his role in the crimes and was convicted and sentenced to life imprisonment.

The state jury convicted Gregory of all counts and sentenced him to death for his role in the murders of Parrish and Hartwig. During the sentencing proceeding, Gregory admitted to being present at the crime scene on August 24, 1991, but he claimed that Bradford alone committed the rapes and murders. In all other respects, however, Gregory's testimony confirmed the story that had been told by Gonzales at trial. In mitigation, Gregory also presented evidence about his childhood, military service, and the possible impact on him of post-traumatic stress disorder, sleep deprivation, and chronic stimulant abuse.

II

The documents that the State provided to Gregory during his state post-conviction proceedings may be summarized generally as follows:

(1) Two documents recorded reports of alleged contacts with the murder victims after the time when the State's evidence showed that they had been killed. In the first document, Willie Lee Freeman reported to state law enforcement officers that he saw a woman he later identified as Bernadine Parrish on August 26, 1991, two days after she was supposedly murdered. Freeman told police he saw Ms. Parrish in a small car traveling about 25 m.p.h. from a distance of about 15 feet. He had never seen the woman before, but identified a photograph of Ms. Parrish and stated that he had seen her face on television. In the second document, Raquel Hartwig reported that on August 27, 1991, three days after Parrish was purportedly murdered, she received a telephone call from a woman who asked to speak to "Raquel." Ms. Hartwig stated that the only people who called her "Raquel" were Bobbie Jean Hartwig and a woman named Vicky. Ms. Hartwig stated that there was static on the line, and then the caller was disconnected.

(2) Three documents were reports about the alleged involvement of third persons in the murders. Paulette Paramore reported that on September 3, 1991, she overheard a discussion between two black men, a Mr. Blount and a Mr. Cooper, indicating that they might have

been involved in the murders. The document indicated that "Cooper drives a light car. Blount just out of prison." In the second document, an unnamed caller told a police officer on September 10, 1991, that Blount, a black male, was with Cooper when they shot the Parrish subject. Finally, the third document indicated that Jasper Grimes reported overhearing Cliritye Blount, Jr., talking to P.L. Phillips and saying that he was "in the car when the guy shot the guy in the back," and that "the girls jumped in and they wouldn't let the boy get in."

(3) One document recorded an interview of witness Maurice Glover on September 12, 1991, in which Glover stated that neither Bradford nor Gregory had told him anything about the murders.

The district court found that the state MAR court's ruling on his <u>Brady</u> claim based on the suppression of these documents was not contrary to, nor an unreasonable application of, clearly established federal law. On this issue, we granted Gregory a certificate of appealability.


III

We review the district court's legal conclusions <u>de</u> <u>novo</u> and findings of fact for clear error. See <u>Monroe v. Angelone</u>, 323 F.3d 286, 299 (4th Cir. 2003).

-8-

Federal courts reviewing petitions for writs of habeas corpus must give great deference to state court judgments on the merits. Vinson v. True, 436 F.3d 412, 416 (4th Cir. 2006). A habeas petition should not be granted unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The state court applied Brady and found that the suppressed evidence was not "material," as required for a due process violation under Brady, in that it did not undermine confidence in Gregory's conviction or sentence. The court found that the evidence of Gregory's guilt was overwhelming. This finding, which is now due great deference, is amply supported by the trial record.

First, Richard Gonzales testified in detail about how the murders were committed and who committed them, directly implicating Gregory. Gonzales' testimony was corroborated by all of the other evidence presented by the State, and Gregory did not present any contradictory evidence at trial. In addition to Gonzales' testimony, Bradford, another participant in the crimes, confessed and was convicted. Moreover, while we need not rely on Gregory's testimony during his sentencing, we nonetheless note that he placed himself at the crime scene on August 24, 1991, rendering virtually

impossible any suggestion that other persons committed the crime at a later date or that the victims were alive after August 24, 1991. The testimony of the participants was corroborated by the testimony of Wesley Parrish, one of the victims, and by evidence found at the scene of the crime, such as the brandy bottle, which was traced to the store at Camp LeJeune, and Bradford's barracks room key, as well as the fact that Bradford did not have his key on August 24 and had to be let into his barracks room.

Thus, the evidence contained in the first two categories of suppressed documents -- suggesting that the victims in this case were still alive after August 24 or that someone other than the three Marines committed the crimes -- is simply overwhelmed by the evidence of record in this case. All three participants admitted to being at the crime scene, disagreeing only about who actually committed the rapes and murders. In addition, all three agree that the two women were in fact murdered on August 24, 1991. This evidence leaves no room for any doubt to be created by the first two categories of suppressed documents.

The third category would have provided some fodder to impeach Glover, but it was nonetheless of minimal value. While Glover initially denied knowing anything about the crime and later admitted that Gregory had told him about it, this inconsistency was readily explained by the fact that Glover was reluctant to implicate his friend in any crime. Conflicting statements made in

these circumstances would not likely reduce Glover's credibility significantly. Moreover, Glover was impeached at trial with his felony convictions and possible motivation for testifying against Gregory. Any value from "piling on" would therefore not have been great.

In Kyles v. Whitley, 514 U.S. 419 (1995), the Supreme Court outlined the standard for determining whether evidence was material under Brady (holding that the suppression of evidence favorable to an accused violates due process only when the evidence is "material either as to guilt or to punishment," 373 U.S. at 87 (emphasis added)). Kyles noted that a showing of materiality under Brady does not require the defendant to demonstrate by a preponderance that disclosure of the suppressed evidence would have resulted in acquittal, or that after discounting the inculpatory evidence in light of the undisclosed evidence there would have been insufficient evidence to convict. Rather, the defendant must only show that there is a reasonable probability that the result would have been different. That reasonable probability is shown if the suppression of the evidence undermines confidence in the outcome of the trial. Kyles, 514 U.S. at 434.

In this case, we agree with the district court that the suppressed evidence simply does not undermine confidence in Gregory's guilt, nor, given the brutality of the crime, in the sentence. Moreover, Gregory has not identified a single Supreme

-11-

Court decision which clearly would have precluded the state court's denial of his MAR.  Rather, the state court identified and applied federal law in a reasonable manner based on the evidence before it.  While Gregory does not agree with its result, he cannot show in what way it was an unreasonable application of <u>Brady</u> case law.

Gregory argues that the State's failure to turn over the evidence prejudiced him by affecting his decision to testify at sentencing and his trial strategy.  This assertion, however, does not make out a claim under <u>Brady</u>, as the Supreme Court has specifically explained:

> It has been argued that the standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence.  Such a standard would be <u>unacceptable</u> for determining the materiality of . . . "<u>Brady</u> material" for two reasons.  First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of a prosecutor's entire case would always be useful in planning the defense.  Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice component of due process refers to the charge rather than the evidentiary support for the charge.

<u>United States v. Agurs</u>, 427 U.S. 97, 113 n.20 (1976) (emphasis added) (citation omitted); <u>see also</u> <u>id.</u> at 108 (rejecting the "sporting theory of justice"); <u>Brady</u>, 373 U.S. at 90 (same).

Finally, Gregory contends that the district court erred in not holding an evidentiary hearing on his <u>Brady</u> claim.  An evidentiary hearing, however, is required only if there is a factual dispute

-12-

that, if resolved in the petitioner's favor, would entitle him to relief.  <u>McCarver v. Lee</u>, 221 F.3d 583, 598 (4th Cir. 2000).  Here, there was no such factual dispute.  The state court assumed that the suppressed evidence was authentic, that it was in the possession of the State, and that it was not given to Gregory before or during trial.  The state court also took judicial notice of Bradford's confession and conviction, which Gregory does not contest.  Thus, the evidentiary hearing would simply have served no purpose; there was no evidence outside the record that needed to be developed at a hearing.

Concluding that the district court did not err in denying Gregory's habeas petition based on an alleged <u>Brady</u> violation, we affirm.

<u>AFFIRMED</u>